UNITED STATES, Appellee

v.

BERNARD J. O'BRIEN, Warrant Officer Junior Grade, U. S. Army, Appellant

3 USCMA 105, 11 CMR 105

No. 1915

Decided July 24, 1953

Lt Col Herman P. Goebel, Jr., U. S. Army, for Appellant.
Lt Col Thayer Chapman, U. S. Army, Lt Col William R. Ward, U. S. Army, and Capt Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

A general court-martial convened at Munich, Germany, convicted the accused, O'Brien, of premeditated murder—the offense proscribed by Article 118(1) of the Uniform Code of Military Justice, 50 USC § 712(1)—and adjudged the supreme penalty. Review by the convening authority and by a board of review in the office of The Judge Advocate General, United States Army, has left the conviction and sentence outstanding. Further consideration by this Court is mandatory in such cases. Uniform Code, supra, Article 67(b)(1), 50 USC § 654(b)(1).

II

Among the several errors assigned by appellate defense counsel, it is urged

that the evidence reflected in the record of trial is insufficient to support the findings of guilty returned by the court insofar as they extend to the elements of (1) premeditation and (2) intent to kill. This contention requires an analysis of the probative facts which the evidence adduced tended to establish.

Accused's victim was his wife. The pair had been married in the United States some six years prior to the present events. During its earlier stages, the marriage appears to have been successful and happy. Later, however, the accused became dissatisfied with his wife's reluctant attitude in the area of sexual relations. His lack of contentment in this respect finally led him to seek feminine companionship outside the home. His wife appears to have been fully aware of those extra-conjugal excursions, and — in his words — "nagged" him about them constantly. The marriage thus came to be characterized by tensions and increasingly unhappy. Accused continued to engage in extra-marital amorous activity; he took rather heavily to drink; and his wife's bickering continued unabated. They quarreled constantly. At one point— although this is a subject of conflict between the accused's testimony on the stand and the content of one of his pre-trial statements—he entertained the notion of killing her. In August, 1951, however, he was transferred to Germany, while his wife and their two children remained in the United States. During succeeding months accused "went out" with several nurses—with one named King in particular. In the late autumn of 1951, he proposed marriage to Captain King. At that time he informed her that he was a divorced man, but that there were two children of the previous union of whom he enjoyed custody. She did not accept his marriage proposal immediately, however, principally because of his parental responsibilities, but as well for the reason that she was several years older than he. Later—in December, 1951, in fact—accused's wife and children entered Germany to join him. However, this effected no significant change in the pattern of his life. He continued to see Captain King as frequently as possible. She was aware that his two children had arrived and were living with him, but had been told by the accused that the woman who had charge of them was a "friend of the family" who had accompanied them to Europe as their "sponsor". At some undisclosed time Captain King elected finally to accept accused's proposal of marriage. With informational assistance from accused, she placed in channels, early in May, 1952, an official request for permission to marry. It appears that they planned to wed about the middle of May, 1952, and to spend the honeymoon in Holland.

About 5:00 o'clock in the morning of May 7, 1952, the accused awoke and —according to his testimony at the trial—sought sexual relations with his wife. She refused and a bitter quarrel ensued. Shortly thereafter he left the room and went downstairs. Some moments later he returned to the bedroom with an entrenching tool, or pick mattock, which he had secured in the basement. With this instrument he struck his wife twice on the head, as a result of which blows she died almost instantly. He secreted the entrenching tool beneath the bathtub. After this, he clothed his wife's body, carried it downstairs, and placed it in a sitting posture in the right front seat of the family automobile. Thereafter he entered the vehicle and drove off. When he had driven for some time—apparently without definite objective—he deliberately directed the car, then proceeding at a rate of at least 50 miles per hour, from the highway into a tree. Passersby discovered the wreckage approximately an hour later. Accused, at that time, was unconscious, although it subsequently appeared that he had not been injured seriously. The doubts of investigating officials were aroused through statements from German witnesses who had observed the accused as he drove his automobile with his wife deeply slumped beside him, and also by indications of post-mortem change suggesting that possibility that Mrs. O'Brien had been dead at the time of the accident. The accused was questioned

**107**

and informed of these suspicious circumstances. On May 9, 1952, he readily admitted that he had killed his wife, and signed a short written statement to that effect. The following day he made and subscribed to a more extensive and detailed written confession.

There can be no doubt that the evidence is sufficient to sustain the finding of an intent to kill. Accused struck his wife twice—and heavily—on the head with an entrenching tool—a pick axe. This conduct is wholly consistent with a purpose to produce the death of the victim. Indeed, it is hardly consistent with any other. His counsel argues here that the wife's continuous carping had driven him insane temporarily, with the result that he was incapable of entertaining a rational intent to kill. That the accused was entirely sane in a legal sense was the unqualified and undisputed testimony of a competent medical expert. The resultant issue of fact was resolved against him by the triers of fact.

In addition, it is argued that the evidence of premeditation is legally insufficient. In this connection also, we must respond in the negative. The existence of an infelicitous—even a wretched—marriage was established. Accused openly admitted to continuous extra-marital adventures to secure that which his wife denied him. At one time—according to his pre-trial statement—he had decided that he must kill her. He had proposed marriage to another woman with whom he had thought he could find happiness, and had been accepted. Indeed, this projected marriage had been set for a day but little removed from that of the homicide. On the morning in question—and this fact, perhaps, is the most significant of all—he purposefully secured a pick mattock *in the basement,* ascended *to a second floor* bedroom, and killed his wife with it. Indeed, there is evidence which argues that his trip to the basement was made with the sole object of arming himself with the tool. In any event, the movement of the pick from basement to bedroom is of grave importance in its bearing on the question of premeditation.

Considering the totality of evidence, we cannot say that it did not permit a determination by the court-martial of premeditation on the part of petitioner beyond a reasonable doubt and within the fair operation of reasonable minds. United States v. Shuler (No. 1599), 2 USCMA 611, 10 CMR 109, decided June 4, 1953.

## III

Apart from questions of sufficiency of evidence, the accused asserts the presence of two additional errors. The first contention is that the law officer erred in permitting an agent of the Criminal Investigation Division to testify that accused, during interrogation, had made a statement to the effect that he had earlier entertained an intention to kill his wife. It is urged that this previous purpose—conceding arguendo that accused had, in fact, formed it—was held so long before the time of the actual homicide as to be incompetent and manifestly prejudicial in the present prosecution. We do not agree. Such an intention is, we think, highly relevant, as tending to establish the possibility of smoldering hatred within the accused's mind against the object of his frustration—a perfectly proper subject of inquiry here.

Finally, appellate defense counsel argues that prejudicial error was committed when trial counsel was allowed during his closing argument to the court, to read two brief extracts from the opinion of a service board of review. Perhaps, strictly speaking, this action may have constituted error; certainly it did not accord with the preferred practice. However, viewed in context, there is no doubt that it posed no fair risk of prejudice to the substantial rights of the accused. United States v. Fair and Boyce (Nos. 908, 1188), 2 USCMA 521, 10 CMR 19, decided May 20, 1953.

Appellate defense counsel has also urged in a Supplemental Assignment of Errors that certain statements of accused introduced in evidence were secured without the warning required by Article 31(b) of the Code, supra, 50

USC § 602(b). Although accused had been repeatedly advised of ■■■■ his right to remain silent, and warned fully that anything he might say could be used in evidence against him, the record does not explicitly reflect that he was informed of the exact nature of the offense of which he was suspected. On the other hand, it does not show that he was not furnished such information. True it is that such a statement on the part of an interrogating official is required by Article 31(b) as a preliminary to a warning that no statement need be made and that any provided may be used in evidence. Therefore, in at least a formal and technical sense, the failure here in question, if any, may have constituted error. However, there is no doubt that the crux of Article 31 (b) lies in its requirement of a warning that the suspect is obliged to make no statement—not in its direction that he be informed of the nature of the offense under investigation. Accordingly, a failure in this latter particular does not warrant the emphatic proscription accorded the former in United States v. Wilson and Harvey (No. 647), 2 USCMA 248, 8 CMR 48, decided February 27, 1953. See also United States v. Duffy (No. 1404), 3 USCMA 20, 11 CMR 20, decided July 3, 1953. In the vast majority of instances a military person subjected to questioning will not long be in doubt as to the object of his interrogators. Although we believe that a failure to advise such a person of the nature of the offense of which he is accused or suspected may constitute error, it is at the same time one which will be deemed prejudicial in only the rare and unusual case. Certainly, there is no showing of a possibility of prejudice here. Only two days prior to the execution of the initial confession, the accused's wife had met a violent death under highly suspicious circumstances. The interrogation had to do with the details surrounding that death. The suspect was advised carefully, repeatedly and at length that he need make no statement whatever, but that if he chose to do so, "it might be used *in a court-martial against him*". (Emphasis supplied.) Given this context, it is inescapable that the accused knew full well that he was suspected of the homicide of his wife.

No prejudicial error appearing, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.