UNITED STATES, Appellee

v.

WILLIE O. JOHNSON, Corporal, U. S. Army, Appellant

5 USCMA 795, 19 CMR 91

No. 5958

Decided May 20, 1955

LT COL Joseph L. Chalk, U. S. Army, and CAPT Frank C. Stetson, U. S. Army, for Appellant.

LT COL Thomas J. Newton, U. S. Army, and 1ST LT A. Kenneth Pye, U. S. Army, for Appellee.

Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused in this case assigns errors arising out of the admission in evidence of certain written documents executed by him under circumstances which will be hereinafter related. Partly because of the incriminating evidence in the instruments, he was found

guilty of stealing $307.00 from a fellow-soldier, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. He was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for two years, and the finding and sentence remain untouched by military authorities. The first document over which a protest is lodged is a receipt signed by the victim, the accused, and two witnesses, in which the former acknowledges payment to him by the accused of $90.00. The second is a typewritten confession signed by the accused in which he admits his commission of the crime. It is the contention of appellate defense counsel that these statements were obtained in violation of Article 31 of the Code, 50 USC § 602, and hence were not admissible in evidence.

There is no serious dispute about the larceny, but there are some areas of disagreement in the testimony concerning the claimed inducement used in obtaining the incriminating statements. We will indicate those conflicts either in reciting the facts or in our discussion of the individual issues.

## II

The victim, Corporal Vaughan, and the accused were members of the same battery and were considered good friends. On August 1, 1954, the victim had $307.00 in a wallet on his person, and toward evening he placed the wallet and its contents in his foot locker. Later in the evening, at the request of the accused, he gave the accused the key to the repository so that the latter could borrow his electric razor. The next morning, the wallet and money were missing from the locker. The loss was reported to Battery Headquarters by Vaughan, and the matter was referred to the Division Military Police Company. The accused was among those suspected of the offense, and consequently he was questioned by a Criminal Investigation Agent assigned to the case. However, he denied any knowledge of the missing article. Sometime prior to August 6, 1954, he voluntarily submitted to a lie detector test, and the results of that examination indicated he was not truthful in denying his

**798**

guilt. That information was relayed to Lieutenant Isaly, the battery commander, who in turn passed it along to Vaughan. Although Vaughan had, prior to this, considered the possibility that the accused had purloined the money—undoubtedly because of accused's access to the locker on the evening of the loss—he had not been sufficiently certain to make any accusation to that effect. Fortified, however, with knowledge of the lie detector examination, Vaughan approached the accused sometime prior to August 6, 1954, and told him that if he took the wallet, all that he, Vaughan, wanted was his money returned. He added that if it was returned, he would use his best efforts to keep the incident at battery level. The accused then admitted his guilt to Vaughan and agreed to repay the missing money.

On Friday, August 6, 1954, Vaughan contacted Lieutenant Isaly and asked for an interview with him. As soon as they were alone, Vaughan requested that the accused be called in and the request was granted. There was no further conversation until the accused arrived. Upon his arrival and in the presence of all three, Vaughan recounted the prior conversation between himself and the accused in which the latter admitted taking the money and agreed to repay it. When Vaughan had finished talking, the accused acknowledged the correctness of the statements attributed to him. At that time, Lieutenant Isaly was informed of the understanding between the two men that, if possible, the incident was to be kept at battery level. He replied that he would do all he could to keep that part of the arrangement but that he would have to make an official report, otherwise he would be holding back evidence. Because of some doubt in his mind about the proper method of dealing with the agreement to repay the money, he suggested that no payment be made at that time and August 12, 1954, was agreed upon as the date for the first remittance to the victim. Sometime "about the 12th, perhaps . . . before—about the 11th, or . . . even before that," but quite evidently before the scheduled meeting on August 12, 1954, the accused approached Lieutenant Isaly to discuss

the matter further, and the Lieutenant informed him that the matter could not be handled within the battery. Parenthetically we might add, this conclusion is supported by testimony appearing in at least three places in the record.

The meeting on August 12, 1954, took place in the unit orderly room. Lieutenant Isaly, his Executive Officer, Lieutenant Michelini, Corporal Vaughan, and the accused were present. Prior to any discussion or transaction, Lieutenant Isaly informed both Vaughan and the accused that they did not have to do anything in furtherance of their plan or make any statement about the offense. He then warned them that anything they did or said could be used against them in a trial by court-martial. However, he neglected to mention any charge of which the accused might be suspected. After completing his warning, he then asked the parties if they still wished to go ahead with the financial transaction, and they replied in the affirmative. The accused followed this conversation by paying $90.-00 to Corporal Vaughan. He was given a typewritten receipt, signed by all parties present, as evidence of the payment. That became the first document which was introduced into evidence by trial counsel over the objection of defending counsel.

The following day, August 13, the accused was taken to the Military Police Company where, after being advised more fully of his rights under Article 31, he signed a written statement in which he confessed to the theft. That statement also was admitted in evidence, over the objection of defense counsel.

In order to place the issues in their proper perspective, it is necessary for us to mention that the testimony disclosing what the accused said in his conversations with Corporal Vaughan and Lieutenant Isaly prior to the warning on August 12, 1954, was excluded from evidence by the law officer because he concluded it was obtained without warning in violation of Article 31 of the Code.

## III

Appellate defense counsel attack the admissibility of the two exhibits on a number of grounds, all of them based on asserted violations of Article 31 of the Uniform Code of Military Justice. They contend: (1) that failure to warn the accused prior to August 12, 1954, of his rights under Article 31 denied the Government the right to use any statement made by him; (2) that promises of benefits to him from both the victim and Lieutenant Isaly were illegal inducements and rendered the statements involuntary; (3) that the warning given by Lieutenant Isaly prior to the August 12, 1954, transaction was inadequate to apprise the accused of his rights not to make any statement; (4) that the receipt given on that date was, in any event, tainted by the prior wrongs of the victim and the Lieutenant; and (5) that the confession to the Criminal Investigation Detachment agent on August 13, 1954, was tainted by the earlier wrongs because at that later date the accused had been deprived of his mental freedom.

## IV

At the outset, we note that the first step apparently leading up to the accused's ultimate downfall was his voluntary submission to a lie detector test. No one compelled him to submit to that examination and it was knowledge of its results which crystallized the victim's belief that he should approach the accused and seek the return of his money. The findings on that test were not offered in evidence, and neither were the accused's answers to the victim's questions. Nevertheless, appellate defense counsel argue that the victim was under a duty at this initial discussion to warn the accused of his rights under Article 31 and his failure in that regard not only rendered the statements incompetent but, in addition, it caused all subsequent proceedings to be inadmissible. We hold otherwise on that contention because the victim here acted only in a personal, and not in an official, capacity. United States v. Gibson, 3 USCMA 746, 14 CMR 164. In reaching that conclusion, we are not unmindful of the fact that it was the criminal investigator who notified the bat-

**799**

tery commander of the polygraph examination results, and that the latter, in turn, notified the victim. We can assume that both of those individuals, by virtue of their assignments and their military duties to investigate, would have been obligated to warn the accused had they sought to interrogate him. But nothing appears in this record to indicate that Corporal Vaughan was acting as their agent, at their instigation, or on behalf of anyone in an official position. His interest in talking with the accused was not to detect and perfect a case against an offender for purposes of prosecution. On the contrary, his behavior was directed toward getting the incident out of judicial channels and his purpose in finding the offender was clearly that of a victim who had lost $307.00 and who wanted to recoup his losses. A more legitimate personal interest on his part is hard to imagine.

## V

We next consider whether any promise by Corporal Vaughan rendered involuntary any incriminating statements made by the accused at that time. The argument is advanced by defense counsel that if the first acknowledgment of guilt was illegally induced, the later ones must be struck down. The testimony regarding any such inducement is doubtful, and there is ample evidence to support a finding that the pledge was not of sufficient moment to render the confession involuntary. But, accepting as true the strongest statement found in the record, which is only a promise by the victim to use his best efforts to induce higher officials to leave final disposition of the offense to the battery commander, we still find no inducement that can be branded as illegal. The general rule on that subject, which we prefer to follow, is found in the following extracts taken from Wigmore on Evidence. In the chapter from which we quote, the author is dealing with the power of the person offering the inducement to affect the result favorably to an accused. After setting forth the development of that subject at common law which, in the older and more usual

view, was that the inducement, to exclude the confession, must have emanated from a person having a legal interest or authority in the arrest and prosecution, Dean Wigmore discourses on the principle as it has been developed in the United States. In Section 830, he states:

"The course of the law in the United States has tended towards the denial of the foregoing strict distinction, by reason of two circumstances. First, in the learned treatise of Professor Greenleaf, published several years before the decision in R. v. Moore (above quoted), it was intimated that the current of authority was against that doctrine, and his own weighty opinion favored that result; and this opinion was widely circulated. Secondly, and chiefly, our system of public prosecution does not admit of such a sharp and easily handled distinction. In England, at common law the person injured by the crime might and (at least in its primary stages) usually must himself institute and manage the prosecution. But in the United States he has no such power; the official prosecutor alone has it. Confessions made to such officials are in this country the commoner class. At the same time, the injured person *may* practically be in a position (by a failure to testify) which gives him actual power to affect the result favorably to the accused. To draw the line absolutely, therefore, at those who alone had legal control over the prosecution would be to omit many who might conceivably under certain conditions hold out inducements of a palpable strength. It thus happens that three distinct rules are found applied in the jurisdictions of the United States:

"(1) The English rule, that the injured individual (*i.e.* in the United States the prosecuting witness merely) is to be deemed a 'person in authority', has occasionally been recognized.

"(2) The opposite extreme—ignoring the inducements of all persons except those having official authority —has also received sanction:

• • • • • •

800

"(3) A middle way is that which most Courts seem to have adopted. The injured person, or the master of a servant, is not regarded as necessarily having a control sufficient to vitiate confessions made by his inducement; nor is he regarded as entirely incapable of holding them out. Each case is decided upon its own circumstances, and the actual state of the relation between him and the confessor is inquired into with reference to the probable strength of the inducement. This seems the wisest rule, and it is in accordance with the recommendation of Professor, Greenleaf, often quoted by the judges: . . ." [Wigmore, Evidence, 3d ed, § 830.]

In dealing with the probable strength of certain inducements, the same work has this to say about promises of legal action. We are quoting from Section 836:

"Coming under the same principle as the preceding class are those promises of other favorable legal action which stop short of promising complete immunity in the shape of pardon, but offer hopes or assurances, definite or indefinite, implying a cessation of prosecution, a recommendation to mercy, or the like.

"(1) A promise in any way implying a *cessation of prosecution* or a *release from arrest* has usually been held to exclude the confession thus induced. If many of these rulings do not commend themselves to common sense, it is not so much because the advantage held out may not conceivably be in a given case a sufficient temptation to false confession, as because the manner of offering it is so indefinite, the assurance so slight and halting, that it cannot be considered as exciting that certain faith in the confessing person which alone could induce him to violate natural instincts and incur sure risk in confessing that of which he is innocent. These are just the inducements which might educe an avowal from a guilty one, but they are too slight to overpower innocence, however weak and ignorant it may be. If, to be sure, the law adopts Mr. Justice Gould's test, that 'the slightest hopes of mercy' suffice to exclude, the result is unimpeachable. But that is not a rational nor a practical test."

In the case at bar, we are not faced with a promise to terminate proceedings or to take any action which would effectuate that result. The pledge offered by Vaughan cannot, as a matter of fact or law, be considered as being of sufficient strength to excite that faith in the accused which would induce him to confess to a theft he did not commit. We recognize he may have believed that by returning the money and thus placating the victim, his chances of having the latter intercede in his behalf might be enhanced. However, before the promise could be of any substantial benefit to the accused, it had to be accepted and acted upon by someone other than the promisor. That was known to the accused, and we cannot accept the bald assertion that such a remote hope of leniency would materially influence him to make a false admission of guilt. He does not contend that he believed Vaughan had the authority to prevent the filing of charges or to grant him immunity from prosecution, and he was never informed that his hopes of escaping with battery punishment might be realized. He was only offered a helping hand by the victim with no reasonable certainty as to its ultimate success. Under different circumstances, he could have been led to believe that Vaughan would assist him in escaping prosecution by not reporting the loss or by refusing to testify and, of course, control over these possibilities was within Vaughan's power. But, here accused knew that the matter had been publicized throughout the unit and had reached the stage of official investigation; he was aware that a higher headquarters was on the alert for the offender; he was informed that the only act promised by Vaughan was that he would seek to induce others to be lenient with the accused; and he was not led to believe that the victim had the power to do more than appeal to the battery commander. The likelihood of the accused confecting a false story to obtain the slight benefit found in that situation

is indeed remote. At best, a promise of that sort could engender within the mind of the accused no more than a hope that the rope which was tightening around him would not be drawn too tightly by those with authority to control the tension. If that mild an inducement were to render a confession involuntary, very few indeed would be admissible. While the promise to quash a pending investigation or to refrain from prosecuting by one occupying a position of authority in the military might cause a serviceman to admit the commission of a crime in which he was not involved, a promise by one enlisted buddy to another to importune those in authority to be considerate could hardly be expected to bring about that result.

## VI

The meeting in the dayroom on August 6, 1954, presents a close question with respect to the ■ necessity for an Article 31 warning. It is true that the accused had previously confessed to the victim and that it was the victim, and not Lieutenant Isaly, who requested the accused's presence there. Furthermore, the court-martial could have found that the Lieutenant did no interrogating prior to the accused's concurrence in the recitation of facts and events by the victim. While the accused testified otherwise, there is a conflict in the testimony on that point as Lieutenant Isaly testified that he asked no questions of the accused. Notwithstanding the conflict, we assume that the Lieutenant should have informed the accused of his rights under Article 31 to render admissible anything said by the accused on that occasion. The officer was the commanding officer of the battery to which the parties were assigned and, as such, he was the officer who most likely would prefer any charges brought against the accused. He is, in fact, the accuser in this case. Further, he was kept informed about the progress of the investigation and, finally, he knowingly became a witness to certain incriminatory acts, conduct, and statements of the accused. No matter how passive his role may have been at the time this part

**802**

of the drama was unfolded before him, his interest was official. Cf. United States v. Dandaneau, 5 USCMA 462, 18 CMR 86. Knowing that the accused would probably make some comments on the statements of Corporal Vaughan, he should have warned the former before permitting the colloquy to enter the area of self-incrimination. But the hiatus which confronts us is that, in this total setting, the failure to warn is not a factor which can be converted into either inducement or coercion of any statement found in this record. That becomes so because any statements made by the accused to the Lieutenant prior to being fully warned were not admitted into evidence and, as will be hereinafter established, the subsequent statements were made only after the accused well knew he need not respond to any questions.

It cannot be said that Lieutenant Isaly's statement that he would do what he could to keep the ■ matter in the unit aids the accused in establishing that he acted and confessed involuntarily. The officer, like the victim, did not lead the accused to believe that the offense would be disposed of at battery level. Appellate defense counsel assert that he did, but we do not so interpret the evidence. The Lieutenant conceded that he first agreed with the parties that he would seek to retain the cause within his unit, but, at the same time, he informed the accused he would have to report what had occurred to higher headquarters as he could not conceal crimes. The officer's version is supported by the accused, who admitted on cross-examination that the Lieutenant had not promised that it could, or would, be kept at battery level. In addition, it is clear that any statements made by the Lieutenant bearing on the retention of disciplinary action within his command were spoken after the accused had conceded his commission of the crime. Hence, they could not have acted as an inducement to the execution of the receipt or the giving of the subsequent confession. But more important, Lieutenant Isaly stated that prior to the meeting of August 12, 1954, at which repayment was effected, he had specifi-

cally informed the accused that disposition of the case would not remain with the battery commander. Although the accused's testimony was contrary to that of the Lieutenant, the court-martial was instructed that it should determine the voluntariness of the admissions and confessions and resolve factual disputes. We assume the instructions were followed and the findings are thus unassailable. United States v. Webb, 1 USCMA 219, 2 CMR 125.

## VII

This brings us to the admissibility of Prosecution Exhibit 1, the receipt which tends to incriminate the accused and which grew out of the meeting of August 12, 1954. At the commencement of that conference, Lieutenant Isaly informed both the accused and the victim that they did not have to say or do anything, and, in addition, he warned them that if they chose to go ahead with any contemplated transaction, anything they did or said could be used against them at a trial. With full knowledge of the consequences, the accused responded that he wished to go ahead with the financial payment. The parties then effected a transfer of the money, and they executed a receipt as evidence of payment. Both knew at that time that any decision on the ultimate disposition of the pending prosecution was beyond the control of the unit commander, and the accused had no reason to believe that either the victim or the Lieutenant could guarantee him immunity from criminal prosecution. Involuntariness in the execution of the receipt, conditioned on either inducement or rank combined with lack of warning, was just not present.

Accused's second attack on the receipt is found in his contention that the warning given by the battery commander was inadequate. We must look to subsection (b) of Article 31 as the one bearing on this issue. That subsection was not read verbatim to the accused, but we have previously held that reading is not essential where an accused is given substantially the same information by other language. United States v. O'Brien, 3 USCMA 325, 12 CMR 81. Missing from the warning given here, and the omission relied on as error, is the fact that the accused was not informed of the nature of the accusation. In basing his argument on that omission, accused is relying on what would have been in this case a hollow ritual. The principal purpose of requiring that an accused be informed of the nature of the crime of which he is suspected is to orient him about the accusation so he can intelligently refuse to answer any question concerning it. In this instance, the accused was so painfully aware of the crime of which he was suspected that any additional statement would have been redundant and repetitious. Our holding in United States v. O'Brien, 3 USCMA 105, 11 CMR 105, governs this point and it does not support the contention advanced by counsel for this accused.

The final argument advanced against the competency of the receipt proceeds as follows: Assuming, arguendo, that the Article 31 warning given on August 12, 1954, be found adequate, and assuming further that there was absent on that occasion any unlawful inducement, the receipt was the product of prior illegal acts and it should not have been admitted into evidence. As we have pointed out, the only prior occurrence of questionable legality was the failure of Lieutenant Isaly to warn the accused of his rights at the August 6, 1954, interview. That being so, the argument is reduced to the assertion that the failure to warn on that date carried over and made the receipt inadmissible.

A confession obtained by unlawful inducement or coercion is inadmissible because there is danger that an accused may have chosen to create a fictitious version to obtain the offered benefits or escape the impending harm. Further, a later confession of the same crime may likewise be false because the factors which induced or coerced the first might still be present and have some residual force and effect. On the other hand, the factors originally present may have been eliminated prior to the subsequent

statement, the accused entirely freed from their persuasive effect, and the second confession the product of free choice. United States v. Monge, 1 USCMA 95, 2 CMR 1; Wigmore, Evidence, 3d ed, § 855. Whether an accused acts freely in giving the second confession, that is, whether the illegal influences have been dissipated or removed, is primarily a factual question. If the facts are susceptible of a finding that the second confession was voluntary, then it is admissible. This is so despite the fact that in making his first confession, the accused "let the cat out of the bag." United States v. Bayer, 331 US 532, 91 L ed 1654, 67 S Ct 1394. In this instance, we are not even confronted with the latter principle for if the bag was opened by the accused, it was done so voluntarily when he incriminated himself in his original discussions with the victim. Neither are we faced with a coerced or induced second admission as those influences must, if they were ever present, arise from either the statement by the victim or the officer that the incident would be kept in the battery or from the lack of warning by the officer. Assuming they existed prior to August 12, 1954, all improper influences had been dissipated before the receipt was executed on that date.

### VIII

We must consider the final contention that Prosecution Exhibit 2, which was the written confession made to Criminal Investigation Agent Brown on August 13, was not admissible. We cannot accept accused's premise of inadmissibility as we find evidence to support the conclusion reached at trial that the confession was insulated from any alleged taint of involuntariness or failure to warn. Aside from the arguments advanced against the admission of the receipt, no serious objection is raised against the admission of the subsequent statement. We have disposed of those arguments contrary to accused's contention, but, in addition, one additional warning under Article 31 of the Code was given to the accused before he executed the complete written narrative

**804**

of his commission of the offense. At the time he executed the confession, he was operating under different circumstances and in the presence of a stranger to the other transactions who completely and thoroughly informed him of his privilege to remain silent. If, at that time, any coercive influence caused him to talk, it arose from his desire to confess his wrong and hope for favorable treatment by the Government. That is not an influence of sufficient strength to render that written confession incompetent.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in the result):

I concur in the result reached by the Court.

### II

As I understand it, four interviews with the accused, Johnson, took place in this case, and during each of these he admitted guilt of the larceny in question. (1) The first—between the victim and the accused—was held sometime prior to August 6. (2) The next —that of August 6—involved the victim, the accused, and Lieutenant Isaly, their battery commander. (3) The same three persons were present on August 12 at the third session, together with Lieutenant Michelini, the battery executive officer. (4) And finally the accused confessed in elaborate detail, and in writing, to Corporal Brown, a military police investigator, on August 13.

A proposal of leniency had been made by the victim in the course of the unofficial first discussion, and was conditionally approved by Lieutenant Isaly during the August 6 interview. The accused received no Article 31 warning at the time of either of these exchanges. However, he *was* warned by Lieutenant Isaly in partial fashion, at least, at the August 12 gathering—and I have no disposition to question the views of the author of the principal opinion concerning the legal effect of the Lieutenant's efforts in this particular. See United

States v. O'Brien, 3 USCMA 105, 11 CMR 105. Finally, Johnson was warned fully by Corporal Brown on August 13 before he executed the statement he made that day. Evidence of only the August 13 confession was introduced at the trial.

### III

Judge Latimer tells us that "Sometime 'about the 12th, perhaps . . . before—about the 11th, or . . . even before that,' but quite evidently before the scheduled meeting on August 12, 1954, the accused approached Lieutenant Isaly to discuss the matter further, and the Lieutenant informed him that the matter could not be handled within the battery." If this constitutes a correct interpretation of the record as a whole, then I can find no sort of inducement problem in this case, save as reliance is placed on a "cat-out-of-the-bag" or "fruit-of-the-poisonous-tree" theory. This is true for the reason that prior to the time the accused confessed—after adequate warning—on both August 12 and 13, he had been responsibly told that the "inducement" had been withdrawn. See United States v. Howell, 5 USCMA 664, 18 CMR 288.

It should be said in this connection, I suppose, that personally I do not interpret the record necessarily to reflect that the accused *had* been so informed —but there is no need that I consider this question, for I agree fully with the organ of the Court that the explicitly conditional promise of Lieutenant Isaly to handle the delict "at battery level" did not constitute a tainting inducement. See United States v. Howell, supra.

Thus, the real issue in this case seems to me to center on the possibility of application of a "poisonous tree" approach to the facts of this case. To put the question in another style: Can it be said with safety that the warning furnished by Lieutenant Isaly at the beginning of the August 12 interview, and the further one supplied by Corporal Brown during that held the day following, served to interrupt whatever dangerous chain of causation may have been present as a result of the unwarned confessions made by the accused to the victim prior to August 6, and to the Lieutenant on that date? Judge Latimer seems to think that this may properly be said—and I am not at all out of agreement with him. In the somewhat similar situation found in United States v. Dandaneau, 5 USCMA 462, 18 CMR 86, I felt otherwise—but a comparison of the relevant facts of that case with those of the present one will demonstrate that the two may be distinguished readily. Cf. United States v. Bayer, 331 US 532, 91 L ed 1654, 67 S Ct 1394.

### IV

For whatever it may be worth, too, it can be said that United States v. Howell, supra, was not handed down by this Court until after this accused had been tried. His case was defended solely on a theory of unlawful inducement, and not at all on the ground that the confession admitted at the trial was the immediate product of earlier ones tainted by want of warning.