UNITED STATES, Appellee

v

WILLIAM P. HASKINS, Basic Airman,
U. S. Air Force, Appellant

11 USCMA 365, 29 CMR 181

No. 13,614

Decided April 8, 1960

*Captain Prichard E. Gray* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel James L. Kilgore* and *Lieutenant Colonel Dwight R. Rowland.*

*Major John C. Wiley* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

GEORGE W. LATIMER, Judge:

I

The accused was found guilty of twenty specifications of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years. The convening authority approved only so much of the sentence as provided for dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for three years. The board of review affirmed the findings and sentence, and accused thereafter petitioned this Court for review, which we granted to consider the following two questions:

Whether the evidence of record is legally insufficient to support the findings of guilty of specification 2.

Whether accused was forced to produce evidence, essential to proof of the shortages, in violation of Article 31, Uniform Code of Military Justice.

II

The facts common to both inquiries will be stated first, and those bearing more directly on each issue will be detailed as the question is answered. Generally stated, the facts are these. For some two and one-half years prior to the detection of these offenses, the accused was in charge of the Air Force Aid Society office at a base in Georgia. Except for brief periods of absences, he was the only person working in the office. A part of his duties consisted of processing applications for loans, maintaining the records of the Society, receiving payments on the loans and issuing receipts therefor, making appropriate entries on the loan cards pertaining to the individual accounts, and making deposits in the Society's bank account of the funds received by him.

In the alleged misappropriations of funds, the accused employed two methods which are relevant to our questions.

Each applicant had to make written application for the amount of the loan desired. On some occasions, the borrowers received checks in amounts in excess of those requested. When that occurred the individual borrower was told by accused that the check was in error as to the amount but to cash the check and return the amount of the overpayment to him. The respective borrowers carried out these instructions, but thereafter the loan application was changed by the accused to show that the borrower had received the amount shown on the face of the check. No credit was given for the amount returned and the money was not deposited to the credit of the Society.

The second pertinent method employed by the accused in his alleged peculations was to pocket funds received as payment on the various loans without crediting the account of the individual concerned with the payment. With one exception, the accused was either identified as the person to whom the payment was made or the receipt given at the time of payment was in his handwriting.

On or about September 16, 1958, the accused was relieved of his duties with the Society for the reason that he was suspected of misappropriating certain funds belonging to the base theater where he worked after duty hours. He was placed in confinement pending investigation and was replaced in the Society by another airman. On or about October 2, 1958, the replacement and a lieutenant, who was the officer in charge of the Society Fund, were encountering difficulty in completing a monthly report required by Air Force regulations. The reason for their difficulty was that they were unable to locate some 34 loan ledger cards which reflected the current status of those particular loans, due to the fact that those forms were missing from the filing cabinet where they belonged. The lieutenant decided the accused's assistance was necessary to locate the records and complete the report, and he therefore had the accused brought to the

Society office. The lieutenant inquired whether the accounts were in proper condition, and the accused replied that they were. Also, he was asked by the lieutenant if he knew where the missing forms could be located, and the accused gave an affirmative reply. The lieutenant then left the room and, when he returned a short time later, the missing ledger cards were handed to him by the accused. Up to that point in the proceedings, the accused had not been advised of his rights in accordance with Article 31, Uniform Code of Military Justice, 10 USC § 831. As a result of the information supplied by the missing ledger cards it was possible to complete the financial report, and it reflected that there were no irregularities. Thereupon, it was duly submitted and published in accordance with Air Force regulations. It was not until later when the lieutenant contacted the borrowers whose accounts appeared to be delinquent and was informed by them that they had made payments for which they had not received credit that suspicion of a shortage in the funds of the Society was aroused.

### III

The specification involved in the first stated issue alleges that on or about July 15, 1957, the accused stole a sum of $40.00 from the Air Force Aid Society. The evidence in relation thereto would permit the court-martial members to find beyond a reasonable doubt that Airman Williams, the borrower involved, dealt only with the accused in his borrowing transactions with the Society; that Williams first obtained a loan from the Society on June 14, 1957, and it was to be repaid in cash in a lump sum when he received his allotment; that Williams repaid this amount of $40.00 to the accused sometime during the month of July 1957, but his account was not credited therewith; that on or about November 6, 1957, Williams obtained another loan of $40.00 from the Society, and it was to be repaid by a Class "R" allotment at the rate of $10.00 per month; that this amount was taken from Williams' pay and sent to the Society during the first months of 1958, but credit for the monthly pay-

ments was improperly applied by the accused to show payment of Williams' first loan.

Appellate defense counsel contend that evidence is insufficient to support the findings because the █ leave record of the accused █ shows he was in a leave █ status from July 3, 1957, until July 29, 1957, and that the ledger card of the Society on the first loan shows it to have been repaid in full. Our answer to that argument will not be extensive. The record shows the ledger card was faked by the accused by entering payments thereon which should have been applied on the later loan. The offense was committed at the time the first loan was repaid and accused converted that money, and payments on a subsequent borrowing improperly credited on the books of the Society do not relieve the accused of his prior criminality in misappropriating the earlier payment. Furthermore, accused's leave record is not conclusive evidence that he was not present on post and thus could not have received the payment. He may have been using up some of his leave without departing from his station, and there is no showing that he was unavailable for payments from July 3 to July 29, 1957. The entry merely shows a leave status which does not dispute the positive testimony by Williams that he repaid the money to the accused personally and, even if it did raise a conflict in the testimony, the court-martial could believe the borrower as against the record. Even official records can be inaccurate. We, therefore, believe that the rule upon which the accused relies, namely, that circumstantial evidence must exclude every reasonable hypothesis other than that of guilt, if applicable in the case at bar, is well satisfied. Accordingly, this assignment of error is resolved against accused.

### IV

The second issue must likewise be determined against the petitioner. There are two reasons which support this conclusion. First, the accused was not a suspect within the meaning of Article 31, Uniform Code of Military

Justice, supra. We mention this facet of the controversy because two questions and answers found their way into the record. The lieutenant asked the accused if he knew where the ledger cards were located and whether his accounts were up to date; and in both instances the lieutenant received an affirmative reply. The second reason for holding against the accused is that he had a duty to turn over completed records to his successor, and a warning to the contrary under Article 31 was not required.

As to the first reason mentioned above, we have no disposition to question the statement by the board of review that the lieutenant's testimony is somewhat self-contradictory. That state of confusion arises naturally when a witness is seeking to explain whether he is suspicious of one who also had custody of separate funds which had been misappropriated. This accused was custodian of theater monies as well as the Society fund and, obviously, when he was suspected of stealing from the former, some doubt might arise in the mind of post authorities as to whether he had taken illegally from the latter. But that is not the sort of suspicion which Congress had in mind when it enacted Article 31, for it provided that the interrogator must inform one suspected of an offense of the nature of the accusation. The suspicion must have crystallized to such an extent that a general accusation of some recognizable crime can be framed. Here it had not and, therefore, it was impossible to apprise the accused of the nature of any charge. See United States v Davis, 8 USCMA 196, 24 CMR 6. No doubt the lieutenant was apprehensive about the state of affairs of the Society, but his actions belie any belief that any offense had been committed at all or that he was accusing the accused of misbehavior, for no questions were asked and no steps taken to audit the books at the time the accused was relieved. Some two weeks thereafter, when a monthly statement required by regulations had to be published, the lieutenant and the accused's successor could not complete the report because

they were unable to locate all the records. The inquiries made at that time were solely for accounting purposes with no thought of maladministration and, when the records were produced, the entries appeared regular, the accounts were audited, and the report was published. Under those circumstances, we would be required to find the lieutenant grossly negligent if prior thereto he had reason to suspect part of the cash assets had been stolen. Ordinary business behavior in addition to the evidence of record dictates rather conclusively that the accused was not suspected of stealing any funds of the Society until the borrowers cast doubt on the accuracy of the records in regard to their loans. That was some time after the production of the records.

In connection with this branch of the controversy, we emphasize the fact that the lieutenant was not conducting an investigation for the purpose of fixing responsibility for an offense which was known to have been committed. Nor was he a law enforcement agent or an officer detailed to collect evidence to aid in solving a crime. Both he and the accused were required by regulations to prepare and submit a monthly report of their stewardship, and his sole purpose in dealing with the accused after the latter's relief of duties with the Society was to gather the information necessary to perform that requirement. Some two weeks had elapsed from the time the accused was relieved until he produced the records, no investigation had been ordered, and the inexperienced replacement had reported nothing irregular. There had been no determination that any Society money was missing, and the conversation involved was not only consistent with the duties imposed upon the parties, but it was required by their relationship to the fund. Finally, there is not the slightest suggestion in this record that the lieutenant was seeking to obtain incriminating evidence against the accused or, for that matter, anyone else.

The second facet of this issue requires consideration of the necessity to warn a custodian of corporate funds subject to Government supervision and
**369**

control before requiring him to produce his book of accounts. If the warning required by Article 31 is to be of any value to an accused for that purpose it would necessitate advice to the effect that he need not produce the books, and that if he did, they could be used against him in a court-martial. Aside from being far outside the sweep of Article 31, such a warning would be in conflict with the law. In United States v Aronson, 8 USCMA 525, 25 CMR 29, we were confronted with a question concerning the officiality of an oath but, in the course of that opinion, we announced this principle of law governing books of accounts:

"The interview between the accused and the Office of Special Investigations agent also bore the stamp of officiality from the accused's point of view. Being entrusted with the fund he was bound to account for it. United States v Valencia, 1 USCMA 415, 4 CMR 7. The obligation to account came into existence at the very inception of his duties. Referring to a similar situation we said in United States v Hopkins, 7 USCMA 519, 522, 22 CMR 309: 'the accused had a positive duty to account for the Government funds committed to his care, and to submit to audits by military authorities.' Thus, from the very moment he assumed control over the fund the accused was, in the language of Judge Pickett in the Levin case, supra, page 91, 'under legal obligation to speak.' "

It ought to be considered hornbook law that a custodian of public monies has a duty to account for funds coming in his possession, and to account means to show properly all receipts and expenditures. If that were not so, the body corporate could never have continuity in its accounting system and the very heart of accounting would be stilled upon the departure of a custodian. It is to be remembered that under law there is no privilege against production such as exists as to private papers. Wilson v United States, 221 US 361, 55 L ed 771, 31 S Ct 538, states the obligations resting upon the custodian of corporate books.

In the course of that opinion, the Court made the following comments which are relevant in the case at bar:

"The fundamental ground of decision in this class of cases is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection.

. . . . .

"The appellant held the corporate books subject to the corporate duty. If the corporation were guilty of misconduct, he could not withhold its books to save it; and if he were implicated in the violations of law, he could not withhold the books to protect himself from the effect of their disclosures. The reserved power of visitation would seriously be embarrassed, if not wholly defeated in its effective exercise, if guilty officers could refuse inspection of the records and papers of the corporation. No personal privilege to which they are entitled requires such a conclusion. It would not be a recognition, but an unjustifiable extension, of the personal rights they enjoy. They may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testmony or the compulsory production by them of their private papers. But the visitatorial power which exists with respect to the corporation of necessity reaches the corporate books, without regard to the conduct of the custodian."

And in the later case of Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256, the rule was reaffirmed in the following language:

"The Court proceeded to analyze the English and American authorities and added, 221 U. S. at pages 381, 382, 31 S. Ct. at page 545, 55 L. Ed. 771, Ann. Cas. 1912D, 558:

370

'The fundamental ground of decision in this class of cases, is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection.'

The distinction is between property to which the government is entitled to possession and the property to which it is not. See 8 Wigmore, Evidence, 3 ed, § 2259c."

To escape the effect of the above-cited cases, appellate defense counsel insist they are inapposite because, at the time of the demand, the accused was not in possession of the ledger cards either actually or constructively. With that contention we disagree. All of the books and records were in his possession at the time he was incarcerated for an offense not connected with the fund in question. While a substitute had been ordered to replace him, it is readily inferable from the record that neither he nor the lieutenant in charge could locate the missing ledger sheets. All other records were found in the office of the Society, but the accused was the only person who knew where the missing records were concealed. They had been segregated from the bulk of the Society records in the proper file for forms of the same class, and it was necessary to contact the accused to determine their whereabouts. Significantly, they were not obtained by him until the lieutenant was absent for a moment and, if they were not intentionally secreted, their location was not readily detectable. Therefore, it would indeed be strange law to hold that this accused could escape being compelled to produce corporate books and records because they were hidden by him from a successor-employee. However, for the purpose of this case, we need go no further than to state that, while they could not be found prior to request, this accused

did produce them without coercive measures having to be taken, after he had talked with the lieutenant. There was no compulsion and no threats or orders and, if relative rank was a factor, the accused did no more than he was legally obliged to do whether that ingredient be present or absent, and that, of course, includes necessary explanatory statements which are no more than auxiliary to production. It is part of the duty of a custodian to hand over to his successor the written records of his administration, and he does not account within the meaning of the law until he furnishes a suitable record of those financial transactions he carried on for the corporation. Records hidden from the corporation do not serve that purpose and, at the very least, a custodian is constructively in possession of them until they are made accessible to other officers or agents of the corporation.

While we have stated the accused was not ordered to produce the ledger cards, we are willing to assume the request was of the same effect. As civilian authorities indicate, books and records of a corporation can be subpoenaed even though they incriminate the custodian, and that is a form of compulsion. In the service, an order to produce records of public funds by one in authority might be considered a form of coercion but, under military law, such an order is legal. We, therefore, conclude that there is no duty to warn a custodian of public funds that he need not produce his records when by law he is required to do so.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

I believe that the ultimate conclusion of my brothers overlooks the substantial distinction between Amendment V, United States Constitution, and Uniform Code of Military Justice, Article 31, 10 USC § 831. The result is that the liberal coverage of the latter is so narrowed that it apparently loses its

effectiveness, unless the interrogation involved is conducted by a law enforcement agent. I must, therefore, record my disagreement with the principal opinion's retreat from our previous, more liberal attitude toward this important protection for a military defendant.

Tried by general court-martial, the accused was found guilty of twenty specifications of larceny, in violation of Code, supra, Article 121, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years. With some reduction in the penalty adjudged, intermediate appellate authorities affirmed, and we granted review on the issues whether the evidence was legally sufficient to support the findings of guilty concerning specification 2 of the Charge and whether accused was required to produce evidence against himself in violation of Code, supra, Article 31. As I agree with Judge Latimer that the evidence is sufficient in law to sustain the verdict concerning specification 2, I concern myself only with the second issue.

Although subject to the nominal supervision of a Lieutenant Crosby, the Air Force Aid Society Officer, the accused was, for all practical purposes, in charge of that Society's office at Turner Air Force Base, Georgia. As such, he assisted applicants in presenting their requests for noninterest bearing loans; processed them through Lieutenant Crosby for approval; disbursed the proceeds to the borrowers; received payments thereon; and maintained all records concerning the transactions. The evidence fairly establishes that he succeeded in stealing Aid Society funds in the form of payments on loans by not crediting them to the borrower's accounts, or by retaining a portion of loan made, or by collusively obtaining a loan in another's name.

On September 16, 1958, accused was relieved of his assignment to the Air Force Aid Society and confined in the Base Stockade on suspicion of misappropriating funds belonging to the Base Theater Fund. He was replaced by Airman Berry. On October 2, 1958, Berry and Lieutenant Crosby experienced difficulty in completing a monthly report of Aid Society transactions. The report involved an internal audit, and they were unable to strike a proper balance. A further check established a shortage of approximately $2,000.00 Account cards were also discovered to be missing. Lieutenant Crosby immediately summoned the accused from the Base Stockade, and, without prior warning under Code, supra, Article 31, asked him if he knew the whereabouts of the missing cards. The accused replied that he did. Lieutenant Crosby directed him to procure them and left the office momentarily. When he returned, the accused presented the cards to him. Crosby testified initially that he did not suspect the accused of any wrongdoing at the time of the interrogation. Subsequently, on cross-examination, he admitted it was "possible" that he had twice previously made extrajudicial declarations to the effect that he had suspected accused of "misdoings in the Air Force Aid Society" as soon as allegations had arisen concerning accused's misappropriation of theater funds. He then testified that, "Based on the records," he did not suspect the accused on October 2, 1958. Upon interrogation by the law officer, Crosby reiterated that he suspected the accused of improper activity on that date, "because if I had not, I would not have asked him if the account was in proper shape, but when he answered me that it was in proper shape I accepted his word." The law officer overruled defense objection to the admissibility of the account cards involved and received them in evidence.

Subsequently, Lieutenant Crosby was recalled by the prosecution. The question whether accused was suspected on October 2, 1958, was again explored. On this occasion, Crosby testified that he did not suspect the accused "of an offense" but "should have said there was a doubt in my mind as to the methods that he was using in the preparation and maintenance of records." He did not maintain this position for any length of time, however, for, on cross-examination, he again stated that

he suspected accused's accounts of being irregular. Following a brief controversy with defense counsel over the meaning of "irregularity," Lieutenant Crosby finally testified that:

"A Well, let's put it this way. Something should have been done that was not done. Whether or not something was done that should not have been done, I did not suspect that."

The author of the principal opinion concludes that there is no basis for the board of review's factual finding that Lieutenant Crosby suspected the accused on October 2, 1958, for "suspicion must have crystallized to such an extent that a general accusation of some recognizable crime can be framed." This assertion is predicated upon the argument that Congress intended, under Code, supra, Article 31, that a suspect be informed of the nature of the accusation against him. I suggest that may brothers' rationale flies in the face of all our former holdings in this area.

Commencing with United States v O'Brien, 3 USCMA 325, 12 CMR 81, this Court has held that Code, supra, Article 31, does not require that the accused be informed of the specific accusation against him. Indeed, Judge Latimer, in United States v O'Brien, supra, stated, at page 328:

". . . It is not always possible to know of all the offenses which might be involved from a given state of facts, *but it is necessary that one suspected of a crime know generally the subject of the inquiry. This puts him on notice of the purpose of the questioning, and thereafter, at least, anything not entirely foreign to the subject under discussion is volunteered at the accused's peril.*" [Emphasis supplied.]

In United States v Johnson, 5 USMA 795, 19 CMR 91, the author of the principal opinion again stated, at page 803:

". . . The principal purpose of requiring that an accused be informed of the nature of the crime of which he is suspected is *to orient him about the accusation so he can intelligently refuse to answer any question concerning it.*" [Emphasis supplied.]

Finally, in United States v Davis, 8 USCMA 196, 24 CMR 6, the Chief Judge remarked, concerning the same problem:

". . . Advice as to the nature of the charge need not be spelled out with the particularity of a legally sufficient specification; it is enough if, from what is said and done, the accused knows the general nature of the charge."

See also United States v Dickenson, 6 USCMA 438, 20 CMR 154; United States v Grosso, 7 USCMA 566, 23 CMR 30; and United States v O'Brien, 3 USCMA 105, 11 CMR 105.

While I have heretofore expressed some disagreement with my brothers' view, see my dissenting opinion in United States v Davis, supra, it is settled law that Code, supra, Article 31, requires only that an accused or a suspect be made aware of the fact that he is believed to be criminally involved in generally described misconduct. United States v Davis; United States v Dickenson; United States v O'Brien, all supra. The necessary corollary to this rule is that the interrogator, in order to "suspect" an individual, *need not* be so aware of the circumstances, that he is able to frame an "accusation of some recognizable crime." Indeed, so to hold results in the absurd contradiction that an investigator need not advise the accused of his suspicions with the precision "of a legally sufficient specification," United States v Davis, supra, but on the other hand, that no "suspicion" can arise unless he possesses the knowledge necessary to frame that type of accusation.

The logical answer to the problem of interpreting the word "suspected" as used in Code, supra, Article 31, is found in its usual definition.

Words used in statutes should normally be accorded their ordinary meaning. United States v Dickenson, supra, at pages 449–450; Caminetti v United States, 242 US 470, 61 L ed 442, 37 S Ct 192 (1917); Sturges v

**373**

Crowinshield, 4 Wheat 122 (US 1819); Swarts v Siegel, 117 Fed 13 (CA 8th Cir) (1902); Sutherland, Statutory Construction, 3d ed, § 4702.

The word "suspect" has a meaning easily determined. Thus, Webster defines it as "Regarded with suspicion; distrusted; mistrusted; doubted." Webster's New International Dictionary, 2d ed, page 2541. It may involve only a slight or vague idea, no matter how it arose, whether on weak evidence or no evidence at all. 40 Words and Phrases, Permanent Edition, "Suspect," page 917. It has been held to involve only "a slight or even vague idea concerning; not necessarily involving knowledge or belief or likelihood." Brown v Broome County, 189 NYS 2d 704, 708. A person should be held "suspected" then, within the meaning of the Code, supra, Article 31, if his interrogator has some vague mental concept that he is, or has, engaged in wrongdoing with reference to a particular subject. As I believe this to be the proper standard to be used in measuring applicability of the remedial provisions of Code, supra, Article 31, I cannot accept Judge Latimer's more stringent view.

Turning to the posture of the evidence in this case, we are immediately confronted with the argument that Airman Haskins was not suspected of any misappropriation by Lieutenant Crosby. Judge Latimer concludes that this contention has merit, albeit under his stricter definition of the term "suspected." I am compelled to reach an opposite result, not only because of my belief that a broader concept is involved, but because of the evidence on the issue in this record.

At the outset, it was clearly established that the accused was involved in the handling of two funds—the one with which we are now concerned and the Base Theater Fund. On September 16, 1958, he was relieved of his duties *in connection with both funds* because it was alleged that he had engaged in criminal peculations with respect to the Theater Fund. Upon his relief from duty, he was immediately confined in the Base Stockade. Surely,

it is extraordinary that his superior officer did not immediately entertain some reservations about the integrity of the other Fund. Assuming, however, that Lieutenant Crosby then had no suspicion of accused in connection with Aid Society monies it is simply unbelievable that he did not suspect him of embezzlement when he became aware that some of the fund records were missing and that it was impossible to balance the books. Indeed, he admits such to have been the case, for he states that he doubted accused's integrity until, in response to his first inquiry, that individual stated that the accounts were in order and restored Crosby's confidence in him.

In United States v Doyle, 9 USCMA 302, 26 CMR 82, we noted that:

". . . At times, in our holdings on cases, we have concluded that testimony offered in support of an accused was incredible. A similar problem confronts us in the case at bar. Either the two officers misunderstood what is meant by the phrase 'suspected of an offense' or their testimony must be characterized as impossible of belief. Trial defense counsel did not examine the witnesses on their understanding of the words, but they must have been using a yardstick unknown to us, for we cannot believe this intensive course of investigation with its many ramifications could start and proceed to the employment of an Office of Naval Investigations special investigator with the first two important interrogators not suspecting irregularities on the part of the accused."

I find the foregoing quotation particularly applicable here. It is unthinkable that a commissioned officer, knowing that his custodian had been relieved and jailed for misappropriation of other monies entrusted to his care, aware that the fund books did not balance, and unable to locate all the records, did not suspect him of embezzlement. His wavering testimony and impeachment by pretrial statements establish the contrary, and I would conclude, as a matter of law, that Lieutenant Crosby not ony suspected the

**374**

accused of some misconduct in connection with the Aid Society's funds, but of the very type of offense ultimately charged against him.

The next issue which arises is whether Code, supra, Article 31, required that an appropriate warning be delivered before questioning accused concerning the whereabouts of the fund records. My brothers conclude that it was not the intent of Congress to have such a warning interposed. In support of their position, the principal opinion cites and discusses the doctrine enunciated by the Supreme Court in Wilson v United States, 221 US 361, 55 L ed 771, 31 S Ct 538 (1911), and Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256 (1946). For the reasons hereinafter developed, I find those cases inapposite to the problem confronting us.

Wilson v United States, supra, holds no more than that the president of a corporation may not rely upon his personal privilege against self-incrimination in refusing to produce corporate records *in his possession and of which he was the custodian*. Davis v United States, supra, involved the right of Government agents, under pertinent Office of Price Administration regulations, to examine ration coupon records in the custody of the defendant gasoline dealer after observing illegal sales of national products. The Supreme Court there found that the defendant consented voluntarily to such examination. Hence, it affirmed the decision of the District Court on the basis that there was *no unreasonable search and seizure of defendant's effects*. Neither of these cases involved an individual who had relinquished his custodianship of records several days prior to his interrogation by a superior concerning their location. To the contrary, both speak only of the duty of an individual to produce corporate or public records *in his possession* upon receipt of a proper demand. That such is not the instant case is demonstrated by Haskins' relief, confinement, and necessary relinquishment of the custody of all fund records on September 16. Lieutenant Crosby's successful interrogation was pointed toward learning the whereabouts of the missing records, and there can be little distinction drawn between their production *from the Fund office* and a verbal answer disclosing their precise location.

This very problem has been the subject of consideration by the same judicial body which decided the *Wilson* and *Davis* cases. In Curcio v United States, 354 US 118, 1 L ed 2d 1225, 77 S Ct 1145 (1957), the Supreme Court was asked to uphold Curcio's conviction of contempt for refusal to answer questions concerning the whereabouts of missing union records. In sustaining petitioner's contention that he was entitled to claim his privilege against self-incrimination, a unanimous Court distinguished Wilson v United States and Davis v United States, both supra, and declared:

". . . From the fact that the custodian has no privilege with respect to the union books *in his possession,* the Government reasons that he also has no privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced. *In other words, when the custodian fails to produce the books, he must, according to the Government, explain or account under oath for their nonproduction, even though to do so may tend to incriminate him.*

"The Fifth Amendment suggests no such exception. It guarantees that 'No person . . . shall be compelled in any criminal case to be a witness against himself. . . .' A custodian, *by assuming the duties of his office,* undertakes the obligation to produce the books *of which he is custodian* in response to a rightful exercise of the State's visitorial powers. *But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony.*" [354 US 118, at page 123.] [Emphasis supplied.]

In United States v White, 322 US 694, 88 L ed 1542, 64 S Ct 1248 (1944), the Supreme Court drew the same dis-

tinction. It there pointed out that there could be no claim of individual privilege when the persons involved were acting as "representatives of a collective group, . . . rather than in a personal capacity." United States v White, supra, at page 699. In short, where, as here, a custodian has been relieved of his duties and is no longer acting in a representative capacity, he is entitled to invoke his rights against self-incrimination in connection with disclosing to his prosecutors the location of the records formerly under his control. No valid distinction can be drawn between the requirement of a verbal disclosure of that fact and the equivalent conduct of the records' production.

Regardless of the interpretation in other United States courts of an accused's privileges under the Fifth Amendment, there is an additional reason for concluding that Lieutenant Crosby failed in his duty when he did not, prior to his interrogation, advise the accused of his rights under Code, supra, Article 31. The coverage of that statute is far broader than the right against self-incrimination conferred by the Fifth Amendment, as interpreted by the Supreme Court in the above-cited cases. It provides, in part, as follows:

"(b) No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

There is nothing in the United States Constitution which demands that an accused be advised by law enforcement agents of his rights, and no civil court has ever imposed that requirement. We nevertheless quickly gave it mandatory effect in the armed services. United States v Wilson, 2 USCMA 248, 8 CMR 48. Of its application in that case, we said:

**376**

"Those provisions are as plain and unequivocal as legislation can be. According to the Uniform Code, Article 2, 50 USC § 552, Sergeant Wang was a 'person subject to this code,' and appellants, at the time the question was directed to them, were persons 'suspected of an offense.' Consequently, the statements should have been excluded. . . . It is, of course, beyond the purview of this Court to pass on the soundness of the policy reflected in those portions of Article 31, supra, which extend the provisions of its comparable predecessor, Article of War 24, supra—and no sort of opinion is expressed thereon."

Here, as there, Lieutenant Crosby was a person "subject to this chapter," and the accused was a person "suspected of an offense." Moreover, there can be no question of the official character of Crosby's activities. See United States v Souder, 11 USCMA 59, 28 CMR 283. How then is he relieved from the transcendent obligation to warn? The author of the principal opinion is content with the assertion that the accused's response to Crosby's demand was "far outside the sweep of Article 31" and a discussion of the Wilson-Davis doctrine. I have heretofore pointed out that his interpretation of those cases is distinctly broader than that set forth in the later decisions, and I suggest that the majority equally attributes too little importance to the specific provisions of Article 31. Its terms are not ambiguous, and it contains no exceptions in favor of the location of records. When it is said that the Article's warning requirement does not apply, judicial interpretation is substituted for the clear command of the legislature. As was pointed out in United States v Wilson, 2 USCMA 248, supra, such interpretation of "plain and unequivocal" declarations is beyond our sphere. See also, Sutherland, supra, page 334; and Sturges v Crowinshield, supra, wherein Chief Justice Marshall declared:

". . . Where words conflict with each other, where the different clauses of an instrument bear upon each other, and would be inconsist-

ent unless the natural and common import of words be varied, construction becomes necessary, and a departure from the obvious meaning of words is justifiable. But if, in any case, the plain meaning of a provision, not contradicted by any other provision in the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, *it must be one in which the absurdity and injustice of applying the provision to the case would be so monstrous that all mankind would, without hesitation, unite in rejecting the application.*" [4 Wheat 122, at page 202.] [Emphasis supplied.]

In short, the words of the statute under consideration contain no phraseology indicating that the Congress did not intend the warning requirement of Article 31 to apply under the circumstances of this case. Respect for the legislative branch of the Government demands that we content ourselves with the logical and reasonable application of the Act's provisions, leaving to Congress the authority to pass such remedial amendments as it deems necessary. In short, I believe that my brothers, in reaching their conclusion, under the guise of judicial interpretation, create exceptions to an Article when the clarity of its terms deny us that privilege.

In sum, then, I am sure that the evidence in this record compels the conclusion that Lieutenant Crosby, at the time of accused's interrogation, suspected that he was in default with respect to the monies of the Air Force Aid Society. The accused had a right to refuse, upon the grounds of self-incrimination, to disclose the whereabouts of the "missing" records, as such were not then in his custody or under his control. Curcio v United States, supra; United States v White, supra. Thus, the inquiries made concerning those records required a preliminary warning under Code, supra, Article 31. Accordingly, Crosby's directions and the accused's production of the records, the equivalent of a statement of their location, should have been excluded.

I would reverse the decision of the board of review and order a rehearing.