UNITED STATES, Appellee

v

FELIX B. GROSSO, Journalist First Class, U. S. Navy, Appellant

7 USCMA 566, 23 CMR 30

567

No. 8341

Decided February 8, 1957

*Lieutenant (junior grade) Mitchell W. Rabbino,* USNR, argued the cause for Appellant, Accused. With him on the brief were *Commander John W. Shields,* USN, and *Francis Berton Perry, Esq.*

*Major Verne L. Oliver,* USMC, argued the cause for Appellee, United States. With him on the brief was *Major Charles B. Guy,* USMC.

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of two offenses, in violation of the Uniform Code of Military Justice, and imposed a sentence which includes a bad-conduct discharge. The convening authority dismissed one of the charges. He approved the sentence, but

suspended execution of the discharge. A unanimous board of review affirmed. We granted review.

The specification of which the accused stands convicted is charged as a violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. It alleges that the accused violated Section 249 of the Penal Code of the State of California by "wrongfully, wilfully, maliciously, and without justifiable cause, writing and forwarding through the U. S. Mails to the San Francisco Field Office of the Federal Bureau of Investigation, a defamatory statement" concerning a Navy lieutenant. The defamatory statement is set out, in pertinent part, in the specification.

At the trial it was shown that an anonymous letter of the tenor alleged in the specification was received on March 23, 1955, by the Federal Bureau of Investigation. It was turned over to Special Agent Tardiff of the Office of Naval Intelligence. Earlier, he had been informed that the subject officer had reported the theft of his wallet. On subsequent investigation, he ascertained that the theft had taken place at the Oakland Young Men's Christian Association. On later dates there were other reported thefts. The lieutenant's wallet was found at the scene of one of these, and his identification card was discovered at another. Agent Tardiff also learned that a "Frank Gross" had registered on the day of each incident. Further investigation disclosed that "Frank Gross" was the accused, and that he had sold a watch which had been taken in one of the reported burglaries.

With two Oakland policemen, Agent Tardiff questioned the accused on May 11, 1955, at the Alameda Naval Air Station. He advised the accused of his right not to make any statement, and that anything he said could be used against him; additionally, he told the accused that he was to be questioned about the burglaries at the YMCA. The accused denied complicity in these crimes. He also denied that he knew the lieutenant. The next day, Agent Tardiff interrogated the accused by himself. Preliminary to the questioning, he showed the accused his credentials and again informed him of his rights. He told the accused that he was to be questioned about the burglaries and as to his "knowledge of, and association with" the named naval officer. The agent produced several photographs of the lieutenant, and on seeing these, the accused remarked: "Oh, that queer. I have seen him a lot of times at the Oakland Y.M.C.A."

At the conclusion of the questioning, the accused reduced his oral statements to writing. He first recited the agent's identification of himself and the purposes of the interrogation. Then, he denied any knowledge of the purported burglaries; but, he gave a detailed account of an alleged indecent act by the officer upon his person in a room at the YMCA. He also admitted that he wrote an anonymous letter "three days later" to the Federal Bureau of Investigation. Moreover, in a subsequent conversation with Agent Tardiff, the accused admitted that he had not been in the officer's room, but still he was "going to stick to" the statement he made earlier.

On cross-examination, Agent Tardiff admitted that he did not specifically tell the accused that he was being investigated on a charge of violating the California law of libel. He maintained that he had "no way of determining what the . . . offense was at that time"; he was only trying to ascertain the truth or falsity of the statements made in the letter to the Federal Bureau of Investigation.

Objection was interposed to the admission of the pretrial statement on the ground that the accused had not been informed of the nature of the accusation against him. The objection was overruled, and the statement was admitted in evidence. In my opinion, the ruling was justified by the evidence.

Agent Tardiff testified that he desired to determine the truth or falsity of the accused's charge. He told the accused that he was to be questioned about his "knowledge of, and association with" the lieutenant. What meaning did this statement have for the ac-

**569**

cused? Certainly, he knew he had written an anonymous letter to the Federal Bureau of Investigation in which he made a serious charge against a Navy officer. A few months later, he specifically denied that he knew the lieutenant. The very next day after his denial he was again questioned. On this occasion he was not merely asked again whether he was acquainted with the lieutenant, but he was told the whole range of his "knowledge of, and association with" the officer was to be delved into. On these facts, the law officer could reasonably conclude that the accused expected the interrogation would extend to his authorship of the letter, and to possible punishment, if its charge was determined to be untrue.

The accused's second claim of error is divided into two parts. First, he maintains that his conviction is illegal because it is based upon a privileged communication to the Federal Bureau of Investigation. The board of review disposed of this contention by referring simply to the Manual for Courts-Martial provision that "the privilege that extends to communications made by informants to public officers engaged in the discovery of crime may be waived by appropriate governmental authorities." Paragraph 151b. This disposition misses the mark. We must distinguish between the disclosure of the communication as an evidentiary question and the substantive problem of whether this kind of communication can be the basis for an independent proceeding against the informant.

Privileged communications in the field of libel are generally classified as either absolute or qualified. 33 Am Jur, Libel and Slander, §§ 124, 125, 317. The former is not actionable, but the latter may be. A report to law enforcement agents by a private person that another has committed a crime enjoys a qualified privilege. This limited privilege, however, does not immunize the informer against prosecution for a crime committed by him in the making of the report. The duty of a citizen to report the commission of a crime is no license to communicate calumnies. The Supreme Court of the State of Kansas

considered this question in State v Wilcox, 90 Kan 80, 132 Pac 982. It was there said (page 987):

"The good faith of a communication is not to be determined solely by the motives which actuate the informer. He may have malicious motives for bringing the accused to justice, may be influenced by malevolent hatred in causing the accusation to be made, provided he have reasonable grounds for the belief that a crime has in fact been committed. But when, knowing that in fact no crime has been committed, he makes the communication in order that a prosecution shall be commenced against an innocent person, for the purpose of wreaking private vengeance, or to levy blackmail, or for any other unlawful purpose, he commits an offense against the law, and cannot claim the protection which public policy has thrown around communications made in good faith for the purpose of having an honest inquiry concerning a suspected crime."

The other aspect of the accused's second assignment of error is that the court-martial erred in that it "assumed that it was necessary to prove the truth of the charge against . . . [the officer] contained in the anonymous letter." Although appellate defense counsel's brief does not make the point clear, we discern a substantial issue. Under the common law, truth was not a defense in a prosecution for a criminal libel. By statute, many jurisdictions provide that truth is a good defense. 33 Am Jur, Libel and Slander, § 320. In another group, which apparently includes California, truth and good motive constitute the defense. However, aside from truth alone as a defense, in the case of a privileged communication, there is still the question of the good faith of the declarant. State v Fish, 91 NJL 228, 102 Atl 378; State v Wilcox, supra; State v Lambert, 188 La 968, 178 So 508. We are thus brought to the law officer's instructions. In substance these instructions informed the court members only of the California law on criminal libel. The law officer read the statutory definition

of libel contained in § 248 of the Penal Code, the punishment therefor as provided in § 249, the requirements for a defense of truth and good motive, and the right of the jury to determine the law and the facts. He further instructed the court members on the provisions of § 256, which reads as follows:

"A communication made to a person interested in the communication, by one who was also interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent is not presumed to be malicious, and is a privileged communication."

At another place, however, he advised the court-martial that *"the occasion and the good faith* of the person making the communication rebut the presumption of malice." (Emphasis supplied.)

Nowhere did the law officer advise the court members of the relationship between a violation of the California Penal Code and a violation of the Uniform Code of Military Justice. The Government attempts to minimize the omission by relying upon our holding in United States v Marker, 1 USCMA 393, 3 CMR 127, to the effect that a specification laid under the general Article does not need to allege that the misconduct is of a discrediting nature. In my opinion, this argument overlooks the substantial difference between the sufficiency of allegation for the purpose of pleading and the sufficiency of an instruction as an adequate framework for the court members' deliberations upon the accused's guilt or innocence. The vast difference between the two is demonstrated by the obvious fact that state law is not military law. See United States v Bryson, 3 USCMA 329, 335, 12 CMR 85.

A violation of a state statute does not by itself constitute a violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The violation must, in fact, and in law, amount to conduct to the discredit of the Armed Forces. Not every violation of a state statute is discrediting conduct. Undoubtedly, if we were to examine the statutes of the several states, we would find hundreds of acts which are made locally punishable but which would not be violations of military law. Members of a court-martial are not presumed to know the law. United States v Keith, 1 USCMA 442, 447, 4 CMR 34. It is apparent, therefore, that an instruction is entirely inadequate when it limits them to a consideration of whether the accused violated a state law, without regard to whether the violation is contrary to military law.

The second outstanding characteristic of the instructions is their confusion. At one point, the court members were advised that a communication to one interested in it is "not presumed to be malicious, and is a privileged communication." At another, they were informed that, although the communication may be found to be defamatory, the occasion and the good faith of the communicant "rebut the presumption of malice." These statements are inconsistent. The second requires the accused to prove not only that the occasion was privileged, but that he acted in good faith in making the statement. That burden is not on him. When a privileged relationship is shown, the prosecution has the burden of proving that the statement was not honestly believed to be true. State v Lambert, 188 La 968, 178 So 508; Strode v Clement, 90 Va 553, 19 SE 177; State v Wilcox, supra.

Defense counsel neither objected to the instructions nor requested any further instructions. However, mere failure to object does not constitute a waiver of a misleading instruction, United States v Noe, 7 USCMA 408, 22 CMR 198, or of an incorrect instruction on a material issue. United States v Rhoden, 1 USCMA 193, 200, 2 CMR 99.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside and the record of trial is returned to The Judge Advocate General of the United States Navy. A rehearing may be ordered.

Judge FERGUSON concurs in the result.

**571**

LATIMER, Judge (dissenting):

I dissent.

Chief Judge Quinn's opinion first asserts that the instructions given by the law officer were deficient in that they failed to require the court-martial to find that the crime committed by the accused was a disorder, a neglect to the prejudice of good order and discipline of the Naval Service, or conduct of a nature to bring discredit upon the armed forces.

In order to understand that facet of this controversy, I consider it advisable to set out the particular letter which is the basis of the charge of libel. My quotation is complete except for the name of the officer involved. For obvious reasons, his identity is not disclosed. Here is the offensive epistle:

"My buddie and I in the Air Force were at YMCA Oakland on Sat. March 19 at midnite when we met a pervert from Tresure Island.

"We checked his name at the desk and it was . . . , BOQ, Tresure Island.

"He was running around naked in the halls and knocke on our doors, and acted queer and talked filthy.

"Please get rid of this man— because he is dangerous to all servicemen.

"We checked his room number at the YMCA at it was no. 723.

"what we cant understand about this pervert is why he lives at Tresur Island and has to spend the nights at YMCA, only 5 miles away."

I see little utility in advancing the proposition that every violation of a state law is not a violation of the Uniform Code of Military Justice and arguing that a prosecution cannot be predicated merely upon the basis of the commission of an act prohibited by a state statute, for the Code does not so provide and the Government does not make that contention. All that is necessary to be decided in this instance is whether the alleged libel has a prejudicial impact on good order in the military service or has a tendency to bring disrepute upon that service. If it has

either effect, the violation of the state enactment is only incidental to the prosecution, for the military formulae must furnish the predicate for the prosecution. The manner in which a state statute may be used for the purposes of supporting a charge in the military was well stated by Mr. Larkin when he was analyzing the proposed provisions of the Uniform Code before Subcommittee No. 1, Committee on Armed Services, House of Representatives. On page 1239 of the Hearings by that Committee on H.R. 2498, Uniform Code of Military Justice, 81st Congress, 1st Session, I find the following statement, which was made by him:

"The construction as to State laws should be clarified to this extent: I believe a violation of a State law would be punishable under the code to the extent it is construed as conduct to the prejudice of good order and discipline but not to the extent of the specific State law itself. We purposely want to avoid trying personnel who happen to commit an offense under State law, by virtue of the tremendous variations between State laws and by virtue of the necessity that would fall upon the court of trying them according to the procedural practices and perhaps even the substantive provisions of one State as against another. But, if the act is to the prejudice of good order and discipline, the fact that it also incidentally is a State law violation as well would bring it under this jurisdiction but not triable as the State would try it."

That quotation merely restates the rule long established in military law to the effect that the proper yardstick to be used to determine the criminality of an act made punishable by a state statute is its impact on good government in the military community. The purpose of Article 134 of the Code, 10 USC § 934, is to prescribe that measuring rod and, while the state statute may for state purposes, define the crime, before it becomes a military offense the prohibited conduct must, as the Article provides, have a direct and proximate

572

impact on good order, discipline, or credit of the service. With that rule in mind, I pass on to consider the crucial question of whether the law officer erred to the prejudice of the accused when he failed to require the court-martial to consider specifically the effect of accused's conduct on the Naval Service.

I have no doubt that in cases such as United States v Fox, 6 CMR 533, which involved loaning money at ■■■■■■ ■ high rates of interest—relied on by the accused and perhaps by my associates to support their views—it can be argued that such a method of conducting an enterprise is neither prejudicial to good order or discipline nor conduct discreditable to the services. In that field of activity, evidence that accused charged a rate of interest higher than that permitted by state law might not be proof of an offense which is violative of military law. State statutes are not uniform as to the amount that may be assessed before the transaction becomes usurious, and reasonable minds may differ as to the rate that could be charged before good order in the military community would be affected. There is, however, a wide range of offenses which may be prosecuted under the general Article, and when we reach the more serious ones, they, by their very nature, affect adversely the tranquility, security, discipline, and good government of the military service. In the event a serviceman takes indecent liberties with a child of tender years, no reasonable person need be told that that offense has an adverse impact on the military service. Every right-thinking person would concede that crimes such as those bring the service into disrepute. However, as we leave that area and proceed down the scale of seriousness, we approach offenses which are more nearly akin to petty crimes. On the lower end of the measuring rod, we find some transgressions which, as a matter of law, do not constitute military offenses. Between the two limits are certain delicts which are in an area of doubt such that reasonable men would not be compelled to reach unanimity on their detrimental impact on military discipline or good order. In those instances, a factual issue arises and it is necessary that the court-martial members determine whether the commission of the crime has that effect. However, in the case at bar, the publication of the libelous charge contained in the letter is an act which would fall in the first category, for I believe every reasonable person would find it to be discreditable and to have a direct impact on morale and discipline. Certainly, when members of the military services maliciously and untruthfully broadcast information that their senior officers are sex perverts who should be discharged from the service because they are dangerous to the men under their command, the confidence and respect of the civilian population is shaken and the faith and leadership necessary to a successful military organization is impaired.

A reference to that part of the Manual for Courts-Martial, United States, 1951, dealing with punitive articles seems to bear out my contention. I note that the independent paragraphs on proofs set out for those offenses discussed under Article 134, pages 381 to 387, do not require a finding on the effect of the crimes defined. The reason should be apparent to all, for the offenses include such atrocious crimes as assault with intent to murder, rape, commit sodomy, and commit indecent acts with children under sixteen years. In connection with the enumerated offenses, it would be an act of sheer futility to require a court-martial to find what is obvious to everyone, namely, that the commission of such offenses has an adverse impact on the military service. The same consideration applies to this offense. I would, therefore, say that the law officer was not compelled to submit to the court-martial members the question of whether the false and malicious libel brought discredit on the Naval Service or impaired good government within it. No doubt he could have done so, but the omission was not prejudicial.

My second ground for dissenting is founded on my belief that the instructions are not confusing and that—if they are not technically correct—any inaccuracy is immaterial. They are rather lengthy and, to conserve space,

**573**

I have not set them out in haec verba, but when they are considered and interpreted as a whole, they meet minimal standards as guideposts and state good principles with sufficient clarity to be upheld.

At least Judge Quinn finds a substantial issue in the instruction dealing with truth. As I understand his, and perhaps their, view, it is to the effect that when the defense is relying on a qualified privilege, the truth of the alleged libel is not material as an issue. I do not accept that doctrine and neither does the accused, for he affirmatively raised the defense and he believed it to be beneficial to his cause. It is to be remembered that under common law, truth was not a defense to a prosecution for criminal libel. In an apparent effort to modify the rigors of that rule, California and other State jurisdictions by statute changed that principle and provided that proof of the truth of the uttered words and good faith in their publication would constitute a complete defense. In this instance, that gave the accused a second line of defense for he could claim his report was true in addition to his assertion of privilege. It is indeed a strange rule which founds error on an instruction setting out a theory contended for by the accused and beneficial to his cause. Certainly I know of no reason to hold that one charged with criminal libel is not entitled to interject the issue of truthfulness as a defense to a charge of libel even though he principally relies upon a qualified privilege to escape criminal responsibility.

In connection with the main ground for reversal, Judge Quinn seizes upon two statements found in the instructions, isolates them from their surrounding concepts, and then reaches the conclusion that they were confusing to the court-martial. Of course, phrases can be torn from context and thus made to appear to be inconsistent, but judicial interpretation does not countenance that form of construction. In order to ascertain inconsistency, if any, the complete charge given to the court-martial must be considered and interpreted, and

when that is done in this instance, confusion is not present. But even if I were to assume to the contrary, the accused cannot complain if the inconsistency arises at his request because he relies on inconsistent defenses.

As I read the record, the accused defended on two theories, both of which are expressed in the instructions. The first was one of absolute privilege and the second was that the statements were true. The law officer rightly concluded that privilege was raised as an issue but that it was qualified and not absolute. In covering those two theories, the law officer, apparently with the consent of defense counsel, quoted the California law on malice and truthfulness, and, at defense's specific request, quoted the statute covering privilege. The statute first mentioned provided that, "An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown." The last mentioned section—which was quoted at accused's request—provided:

> "A communication made to a person interested in the communication, by one who was also interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent is not presumed to be malicious, and is a privileged communication."

I interpret those two sections to mean that a libelous statement is presumed malicious unless there is a justifiable motive for making it, but when a qualified privilege exists, a good motive is present and malice is not presumed. The general rule seems to be that if the publication is defamatory, the burden of going forward with the defense of privilege falls on the accused. He can raise that issue by showing the occasion and his good faith in publishing the defamatory statement.

That is in substance what the law officer said, for he stated:

> "When under such occasions, qualified occasions, communications, usually called 'privileged communications', are made in good faith, and with a sincere belief in their truth, then, although they are defamatory, and, may even be untrue, yet the occasion and

574

the good faith of the person making the communication rebut the presumption of malice, and, therefore, no prosecution for libel can be maintained."

I find nothing incorrect or misleading about that concept when it is applied to the facts and other instructions in this case, for, contrary to Judge Quinn's opinion, the law officer did not require the accused to prove his good faith. The published letter was libelous on its face and under the law, malice was presumed. However, the accused raised the issue of qualified privilege by showing that the communication was forwarded to the Federal Bureau of Investigation. That left the good faith of the accused in issue before the question of privilege could be determined. That issue was left to the court-martial members under proper directions. Certainly if the accused reported the incident in good faith, he was not actuated by malice. Conversely, if ill will prompted him to make the report, he did not act with candor. The law officer appreciated that a factual determination on that subject was necessary, for on two occasions he informed the court-martial members that malice was an element of the offense and that the burden was upon the Government to establish that ingredient of the crime. If they found malice, they could not find good faith and there would be no qualified privilege. Accordingly, I do not believe that the law officer placed a burden upon the accused to establish any element of the offense. On the contrary, I think it clear and positive that he understood and properly advised the court which of the parties had the duty of going forward and that the burden of proof on the issues framed by the evidence was on the Government.

For the foregoing reasons, I would affirm the findings and sentence.