# United States Navy–Marine Corps Court of Criminal Appeals

Before
DALY, HARRELL, and KORN
Appellate Military Judges

_____

**UNITED STATES**
*Appellant*

**v.**

**Malik A. SCOTTGEORGE**
Corporal (E-4), U.S. Marine Corps
*Appellee*

**No. 202500317**

_____

Decided: 25 February 2026

Appeal by the United States pursuant to Article 62, Uniform Code of
Military Justice

Military Judge:
Derek A. Poteet

Before a special court-martial convened at Quantico, Virginia.

For Appellant:
*Lieutenant K. Matthew Parker, JAGC, USN*
*Captain Jacob R. Carmin, USMC*

For Appellee:
*Lieutenant Commander Marc D. Hendel, JAGC, USN*

Senior Judge HARRELL delivered the opinion of the Court, in which Chief Judge DALY and Judge KORN joined. Judge KORN filed a separate concurring opinion.

————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

————————————

HARRELL, Senior Judge:

This case is before us on an interlocutory appeal pursuant to Article 62(a)(1)(B), Uniform Code of Military Justice (UCMJ).[1] Appellee is charged with one specification each of attempted obstruction of justice, false official statement, wrongful use of a controlled substance, wrongful broadcast of intimate visual images, and extortion in violation of Articles 80, 107, 112a, 117a, and 127, UCMJ.[2] The military judge granted a Defense motion to suppress Appellee's statement to Naval Criminal Investigative Service (NCIS) special agents, and the Government raises this issue on appeal: Did the military judge abuse his discretion when he suppressed Appellee's warned confession to NCIS special agents? We conclude that the military judge did not abuse his discretion, and we deny the Government's appeal.

## I. BACKGROUND

In advance of interrogating Appellee, an NCIS special agent provided a rights advisement pursuant to Article 31(b). The special agent advised Appellee that he was suspected of abusive sexual contact in violation of Article 120 and extortion in violation of Article 127. Appellee signed a rights waiver and spoke with the special agents. Later during the interrogation, the special agent provided Appellee with a second rights advisement, this time advising Appellee that he was suspected of wrongful broadcast or distribution of intimate visual images in violation of Article 117a. The second rights advisement included

————

[1] 10 U.S.C. § 862(a)(1)(B).

[2] 10 U.S.C. §§ 880, 907, 912a, 917a, 927.

2

a cleansing warning.[3] Appellee signed a second rights waiver, and the interrogation continued.

Trial defense counsel filed a motion to suppress Appellee's video recorded statements to the NCIS special agents on the grounds that the initial Article 31(b) rights advisement was defective, and Appellee did not voluntarily, knowingly, and intelligently waive his rights. The military judge granted the motion in a written ruling, concluding that "[e]ach of the two separate rights advisements by NCIS special agents were materially flawed," and as a result, "The Government has not met its burden of proving by a preponderance of the evidence that the Accused's statements to NCIS were properly warned, made knowingly and voluntarily, and/or are otherwise admissible."[4]

With respect to the first rights advisement, the military judge concluded that it

> failed to sufficiently orient the Accused to the transactions or incidents about which the government agents wanted to question the Accused, even after the Accused plainly stated that he was confused and he asked to be oriented. To this request by the Accused, the NCIS special agents stated he would need to waive his rights and agree to talk with them in order for them to explain. This was incorrect and misleading, and the Court concludes that, at the NCIS special agent's express invitation, the Accused's verbal acquiescence and his signature on the written waiver form were obtained in reliance on this incorrect and misleading statement, at a moment when the evidence shows that the Accused had not been sufficiently oriented to the transactions or incidents about which the government agents wanted to question the Accused. . . .
>
> . . . .
>
> . . . The first rights advisement was inadequate. The first advisement also improperly used the Accused's own request to be oriented to the transaction or incident of which he was suspected, as leverage to induce the Accused to waive his rights. The government agents invited the Accused to waive his rights

---

[3] "A cleansing warning is one in which the 'accused [is] warned that a previous statement cannot be used against him.'" *United States v. Brisbane*, 63 M.J. 106, 114 n.9 (C.A.A.F. 2006) (alteration in original) (quoting *United States v. Cuento*, 60 M.J. 106, 109 (C.A.A.F. 2004)).

[4] Appellant's Mot. to Attach, App'x B at 3, 6. The Court granted Appellant's motion to attach on 12 August 2025.

and talk to them expressly so that they would then be able to orient him to the transactions and incidents they were investigating. After the Accused accepted this invitation and did so, the Government as to this motion has a challenging task of proving that the Accused's waiver did not result from this improper leverage and inducement. And the Government here has not so shown.[5]

With respect to the second rights advisement, the military judge concluded that it "was vague, misleading, inconsistent, and incomplete" since

> [t]he government agents at first seemed to say the second rights advisement was needed because the Accused had disclosed new evidence causing them to now suspect him of an additional offense: broadcasting or distributing intimate images. But the evidence indicates that, before the interrogation began, the NCIS special agents likely already suspected the Accused of this "additional" offense. . . . Among other issues, the second rights advisement begs the question of why the agents did not notify the Accused during the initial advisement that he was suspected of this offense.
>
> . . . [T]he agents did not appear to finish the explanation or description of the second rights advisement as being necessitated by disclosure of evidence of an additional offense before they then seemed to change tacks, and to instead describe the second rights advisement as a cleansing warning necessary to cure a previous defective advisement. The agents advised the Accused that nothing used previously could be used against him, and asked him if he wanted to waive his rights and speak with them, but they did so without any change in the government agents involved, without a meaningful break in time or other attenuation of any previous taint, or even a meaningful explanation of the previous taint, and further, without readvising him that he was still also suspected of either [of] the offenses mentioned during the original advisement. The government agents also characterized the second rights advisement as a mere formality.[6]

---

[5] Appellant's Mot. to Attach, App'x B at 3–4.

[6] Appellant's Mot. to Attach, App'x B at 5.

The Government provided timely notice of appeal of this "ruling which excludes evidence that is substantial proof of a fact material in the proceeding."[7]

## II. DISCUSSION

### A. Law

In an Article 62 appeal, we "consider the evidence in the light most favorable to the party that prevailed at trial—in this case, Appellee."[8] "We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion," which "occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law."[9] Further, "It is an abuse of discretion if the military judge: (1) 'predicates his ruling on findings of fact that are not supported by the evidence'; (2) 'uses incorrect legal principles'; (3) 'applies correct legal principles to the facts in a way that is clearly unreasonable'; or (4) 'fails to consider important facts.'"[10] "We review de novo any legal conclusions supporting the suppression ruling . . . ."[11]

Article 31(b) provides:

> No person subject to [the UCMJ] may interrogate, or request any statement from, an accused or a person suspected of an offense without first *informing him of the nature of the accusation* and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.[12]

---

[7] Article 62(a)(1)(B), UCMJ. Both parties and we agree that we have jurisdiction over this appeal.

[8] *United States v. Flanner*, 85 M.J. 163, 169 (C.A.A.F. 2024) (citing *United States v. Becker*, 81 M.J. 483, 488 (C.A.A.F. 2021)).

[9] *Id.* (citation modified).

[10] *Becker*, 81 M.J. at 489 (quoting *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017)).

[11] *Flanner*, 85 M.J. at 169.

[12] 10 U.S.C. 831(b) (emphasis added).

Failure to comply requires suppression: "No statement obtained from any person in violation of [Article 31], or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial."[13]

Our superior court, acknowledging that Article 31 does not "indicat[e] the degree of specificity" that must be provided regarding the nature of the accusation,[14] and noting that "each case must turn on its own facts,"[15] has drawn general contours to the requirement across several cases dating back to the infancy of the Code. In one of the earliest opinions on the topic, the United States Court of Military Appeals (CMA) stated, "The principal purpose of requiring that an accused be informed of the nature of the crime of which he is suspected is to orient him about the accusation so he can intelligently refuse to answer any question concerning it."[16] The court elaborated a few years later, "The purpose of informing a suspect or accused of the nature of the accusation is to orient him to the *transaction or incident* in which he is allegedly involved."[17] Regarding the level of specificity required, "Advice as to the nature of the charge need not be spelled out with the particularity of a legally sufficient specification; it is enough if, from what is said and done, the accused knows the general nature of the charge."[18] More recently, the United States Court of Appeals for the Armed Forces (CAAF) explained:

---

[13] Article 31(d), UCMJ. *See also* Mil. R. Evid. 304(a) ("If the accused makes a timely motion or objection under this rule, an *involuntary statement* from the accused, or any evidence derived therefrom, is inadmissible at trial . . . ." (emphasis added)); Mil R. Evid 304(a)(1)(A) (" 'Involuntary statement' means a statement obtained in violation of the self-incrimination privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, *Article 31*, or through the use of coercion, unlawful influence, or unlawful inducement." (emphasis added)).

[14] *United States v. Rogers*, 47 M.J. 135, 137 (C.A.A.F. 1997).

[15] *United States v. Nitschke*, 12 C.M.A. 489, 492, 31 C.M.R. 75, 78 (1961).

[16] *United States v. Johnson*, 5 C.M.A. 795, 803, 19 C.M.R. 91, 99 (1955).

[17] *United States v. Rice*, 11 C.M.A. 524, 526, 29 C.M.R. 340, 342 (1960) (emphasis added).

[18] *United States v. Davis*, 8 C.M.A. 196, 198, 24 C.M.R. 6, 8 (1957) (citing *United States v. Grosso*, 7 C.M.A. 566, 23 C.M.R. 30 (1957); *Johnson*, 5 C.M.A. at 795, 19 C.M.R. at 91). *See also Rice*, 11 C.M.A. at 526, 29 C.M.R. at 342 ("It is not necessary to spell out the details of his connection with the matter under inquiry with technical nicety.").

> The precision and expertise of an attorney in informing an accused of the nature of the accusation under Article 31 is not required . . . . Nevertheless, the accused or suspect must be informed of the general nature of the allegation, *to include the area of suspicion that focuses the person toward the circumstances surrounding the event.*[19]

When evaluating whether this requirement has been met, we look at the "precise wording of the warning"[20] not in isolation, but in the context of "the surrounding circumstances and the manifest knowledge of the accused . . . ."[21] "A partial advice"[22] as to the nature of the accusation, therefore, is not necessarily fatal. Factors to consider "in determining whether the nature-of-the-accusation requirement has been satisfied are whether the conduct is part of a continuous sequence of events, whether the conduct was within the frame of reference supplied by the warnings, or whether the interrogator had previous knowledge of the unwarned offenses."[23] "Other factors might also bear on the application of Article 31(b), including, . . . the complexity of the offense at issue."[24]

## B. Analysis

The crux of the Government's argument is that the military judge abused his discretion since "law enforcement properly informed Appellee of the general nature of the charge by advising him . . . he was suspected of extortion and sexual abuse, telling him which Articles of the Code he was suspected of violating, and then explaining generally what those terms meant. . . . A more particularized warning was not required."[25] Based on the specific facts of this case, we disagree and conclude the military judge did not abuse his discretion.

---

[19] *United States v. Simpson*, 54 M.J. 281, 284 (C.A.A.F. 2000) (emphasis added) (citations omitted).

[20] *Rogers*, 47 M.J. at 137.

[21] *Davis*, 8 C.M.A. at 198, 24 C.M.R. at 8.

[22] *Id.*

[23] *Simpson*, 54 M.J. at 284 (citations omitted).

[24] *United States v. Pipkin*, 58 M.J. 358, 361 (C.A.A.F. 2003).

[25] Appellant's Brief at 14.

The military judge concluded that the special agent provided partial advice regarding the nature of the accusation, which was not salvaged by the surrounding circumstances or the manifest knowledge of Appellee. Specifically, the military judge ruled:

> The initial rights advisement failed to sufficiently orient the Accused to the transactions or incidents about which the government agents wanted to question the Accused, even after the Accused plainly stated that he was confused and he asked to be oriented. . . .
>
> . . . [T]here was a partial advisement, but not a full advisement which oriented the Accused to the transaction or occurrence in which he was suspected of being involved. While it is possible that the Accused was playing dumb by pretending not to understand, that possibility is not supported by any clear evidence and would simply be a speculation. Instead, the greater weight of the evidence strongly supports the Defense argument that, even considering "the surrounding circumstances and the manifest knowledge of the accused" this Accused was not sufficiently oriented or advised. The Accused credibly expressed a confused impression that he had thought the interrogation was about his recent positive urinalysis result for a controlled substance. He asked where the abusive sexual contact and extortion allegations were coming from, and he was advised improperly that he would need to waive his rights and talk to the NCIS special agents in order for them to tell him about that."[26]

---

[26] Appellant's Mot. to Attach, App'x B at 3–4. We accept and are bound by the military judge's finding of fact that Appellee expressed a confused impression with respect to the advice regarding the nature of the accusation. This finding is supported by the evidence in that it reflects that immediately after the special agent advised Appellee that he was suspected of violating Article 120, abusive sexual contact, and Article 127, extortion, and providing lay definitions of those offenses, Appellee expressed that he was "confused on what exactly this is--where this is coming from exactly. . . . [W]hat brought this up?" Video Rec'g of Appellant's NCIS Inv'w, App. Ex. III, encl. 5 at 14:00. However, we reject as clearly erroneous that such confusion *at that moment* was "that he had thought the interrogation was about his recent positive urinalysis result for a controlled substance." The record instead reflects that at other moments of the interrogation, Appellee expressed that he *expected* the interrogation to relate to a positive urinalysis result. Regardless, Appellee expressed confusion when advised of the offenses he was suspected of committing, and he "request[ed]" information "to be oriented to the transaction or incident of which he was suspected," as the military judge found. Appellant's Mot. to Attach, App'x B at 4.

The military judge's ruling is supported by contrasting the facts of this case with the facts of cases in which our superior court assessed the sufficiency of nature-of-the-accusation advice. For example, in *United States v. Simpson*, the CAAF found sufficient orientation when the interrogator "verbally warned appellant that he was being questioned about indecent acts or liberties *with AP*. The offenses of indecent acts and sodomy are sufficiently related so that the warning oriented appellant toward the nature of the accusations against him."[27] Similarly, in *United States v. Rogers*, the CAAF wrote:

> [T]he interrogator asked about "what happened with your sister." Before further questioning, they took a break. When they returned, [the interrogator] reminded appellant of his rights, and appellant acknowledged that he still understood them.
>
> Under these circumstances, further rights' advisement was unnecessary. Appellant had already been warned of the nature of the accusation, that is, sexual assault *concerning his sister*, prior to the break and before further questioning. During the ensuing interview, he made admissions concerning the complaint of his sister.
>
> We hold that, under these circumstances, appellant was adequately advised of the nature of the accusation . . . .[28]

And in *United States v. Quintana*, the CMA considered the sufficiency of this advice to the appellant: "I advised him that he was a suspect in a theft of U.S. government property, larceny of U.S. Government property, as I recall specifically, *ship's store funds from the USS HASSAYAMPA*."[29] The court held:

> Appellant's misuse of the fund was greater than the larceny of which he was informed, but that advice clearly oriented him to the fact that misuse of *the ship's store fund* was the object of the investigation. The appellant's disclosure of incidents of misuse other than that mentioned by the agent was within that frame of reference. Thus, we conclude that the advice was sufficient.[30]

---

[27] 54 M.J. at 284 (emphasis added).

[28] 47 M.J. 135, 138 (C.A.A.F. 1997) (emphasis added) (citation omitted).

[29] 5 M.J. 484, 485 (C.M.A. 1978) (emphasis added).

[30] *Id.* at 487 (emphasis added).

This Court's opinions illuminate as well. In *United States v. Skinner*, the appellant was notified that he was "suspected of sodomizing *GSMFA [AP]*,"[31] and we held:

> The warning about sodomy was adequate to notify the appellant that he was suspected of engaging in misconduct of a sexual nature with GSMFA AP in the bathroom of the Dog House bar in November 2009. . . . It was not then necessary for NCIS [agents] to provide specific warnings about each and every possible crime that the appellant might have perpetrated against the victim while in the bathroom that night. The rights advisement form provided by NCIS [agents] oriented the appellant generally to the nature of the crime that he was suspected of committing.[32]

And in *United States v. Oakley*, a special agent "verbally warned the appellant that he was being questioned about indecent assault *on his stepsister at a family gathering on 29 April 2011*," and we held, "The charged crimes [of aggravated sexual assault and indecent act] concerned a continuous sequence of indecent acts within a day of the date supplied by the warnings. Under the circumstances, we find that the Article 31(b) warnings sufficiently oriented the appellant to the nature of the accusations against him . . . ."[33]

So, not just indecent acts, but indecent acts with a named person; not just sexual assault, but sexual assault of the suspect's sister; not just larceny, but larceny of a specific ship's funds; and so on. The military judge found no facts regarding similar *minimal* details of the transaction or incident under suspi-

---

[31] No. 201000555, 2011 CCA LEXIS 140 at *6 (N-M. Ct. Crim. App. July 29, 2011) (unpublished) (alteration in original) (emphasis added).

[32] *Id.* at *11. Relevant to the "surrounding circumstances and manifest knowledge of the accused" discussion below, the Court also noted that "the appellant had previously been questioned about that same incident and even admitted when first speaking with the NCIS agents that he was aware of the suspicion surrounding him in relation to GSMFA AP." *Id.*

[33] No. NMCCA 201200299, 2015 CCA LEXIS 154 at *29–30 (N-M. Ct. Crim. App. Apr. 21, 2015) (unpublished) (emphasis added) (citation omitted). *See also United States v. Elespuru*, No. ACM 38055, 2013 CCA LEXIS 644 at *7–8 (A.F. Ct. Crim. App. July 9, 2013) (unpublished) ("Although the term 'inappropriate conduct' alone might not have been sufficiently detailed to orient the accused as to the nature of the offense, [the interrogator] also told the appellant that it was inappropriate conduct *involving Amn AL*. This added detail focused the appellant on exactly the conduct of which he was suspected." (emphasis added)), *aff'd in part and set aside in part on other grounds*, 73 M.J. 326 (C.A.A.F. 2014).

cion in the special agent's advice to Appellee, and our review of the record reveals no indication that the military judge's findings are incomplete[34] or that he abused his discretion by failing to consider important facts.

Notably, the advice here is not under scrutiny for lack of technical nicety, but for consisting *only* of technical nicety, omitting any detail of the transaction or incident to be the subject of questioning. Practicality, not abstraction, matters. *United States v. Reynolds* is instructive in this regard. There:

> [The interrogator] did not comply with the terms of . . . Article 31, before interrogating the accused. Thus, he frankly admitted he made no effort to inform Reynolds that he was suspected of taking Colonel Parker's car, although he believed Reynolds to have done so. . . .
>
> . . . .
>
> . . . True it is that we have frequently pointed out it is not necessary to spell out the details of accused's alleged misconduct with technical nicety in order adequately to inform him of the nature of the charge being investigated. It suffices if the accused is made aware of the general nature of the allegations involved. This simply means that neither this Court, nor Congress in enacting . . . Article 31, expected a police officer to use the precision of an attorney or pleader in informing the accused of the subject matter of his interrogation. The statute requires only "the *nature* of the accusation" to be disclosed—not that it "be spelled out with the particularity of a legally sufficient specification." Hence, *it would have been enough here for [the interrogator] to have drawn accused's attention to the taking of Colonel Parker's automobile, without specific reference to the technical terms "larceny" or "wrongful appropriation."* This is the sort of orientation of which we have previously spoken, and such was the meaning of Congress when it enacted . . . Article 31.[35]

The military judge's conclusion that the surrounding circumstances and manifest knowledge of the accused did not save the deficient advice is also supported by contrasting the facts of this case with others that examine this issue. For example, in *United States v. Pipkin*, even though the appellant was not

---

[34] *See United States v. Kosek*, 41 M.J. 60, 64 (C.A.A.F. 1994) ("The appropriate remedy for incomplete or ambiguous rulings is a remand for clarification.").

[35] 16 C.M.A. 403, 405, 37 C.M.R. 23, 25 (1966) (second emphasis added) (citations omitted).

advised that he was suspected of conspiring to distribute drugs, an offense with which he was later charged, the CAAF nevertheless found sufficient orientation:

> [T]he military judge found that Appellant knew he was being interrogated, in part, because of his relationship to A1C Skinner [, the co-conspirator]. He also found that initially, Appellant characterized the money he gave A1C Skinner as a loan for debts and only later admitted that it was for the purchase of drugs. This particular finding suggests that Appellant was aware that the interview was going to focus on the financial aspect of his relationship with A1C Skinner. Finally, the military judge found that Appellant had been verbally informed that he was suspected of drug distribution. Therefore, the area of suspicion on which Appellant was focused at the time of the warnings, and before any admissions, was A1C Skinner's suspected drug distribution and his own suspected complicity in the distribution. At the outset of the interview, the SAs were not required to identify each possible theory of accomplice liability a prosecutor might later pursue.[36]

In *United States v. Nitschke*, the CMA found advice to the appellant "that the statement was being taken in connection with investigation of the 'traffic accident [in] which he was involved'" to be sufficient orientation "to the incident under inquiry" despite deliberate omission by the investigator "that a fatality had resulted from the collision,"[37] and the statement was used against him in a prosecution for negligent homicide. Crucial to this conclusion was the appellant's "manifest independent knowledge or state of belief, as evidenced by his statements and his trial testimony,"[38] specifically:

> Accused . . . testified that before he was taken to the dispensary, he heard someone say three—not just one—persons had been killed in the collision; that he felt it might be his fault these people were killed; and that this thought preyed on his mind and consumed his attention. Additionally, the witness who picked accused up at the scene of the accident testified, in describing his

---

[36] 58 M.J. at 361.

[37] 12 C.M.A. at 491–92, 31 C.M.R. at 77–78.

[38] *Id.* at 492, 31 C.M.R. at 78.

distressed emotional state and recounting possible suicidal actions by him, that accused kept repeating "Let me die, I want to die; I just killed someone."[39]

The Air Force Court of Criminal Appeals has considered the sufficiency of nature-of-the-accusation advice in several opinions as well. In *United States v. Elespuru*, the court resolved a similar issue in part on the "manifest knowledge of the accused":

> The only other question [the interrogator] asked the appellant after giving the Article 31, UCMJ, warning was the open-ended question to prompt him to describe what happened. The appellant's response showed no confusion and directly addressed the incident under investigation, and he confessed to touching the victim inappropriately while she was asleep on his couch. The fact that he needed no further prompting or orientation and he did not address some unrelated incident when asked to tell what happened showed, without a doubt, that he was oriented towards the suspected offense and was aware of the incident that was being investigated.[40]

Our Air Force colleagues have also resolved these issues on the "surrounding circumstances" of the nature-of-the-accusation advice. In *United States v. Simmons*:

> Appellant was advised of his rights after being present for the search of his home and seizure of the bedding, condom wrappers, and beer bottles. These items in particular would be associated with Appellant's home as the site of the offense, and indicate that the conduct of interest was sufficiently close in time to the search to make such items relevant. The later advice that agents were investigating "rape" would also clearly focus Appellant on any behavior that might constitute sexual relations without valid consent. We find that it was not an abuse of discretion, in light of the circumstances of the search and interrogation, for the military judge to rule that Appellant was adequately advised of the nature of the allegation against him.[41]

---

[39] *Id.* at 491, 31 C.M.R. at 77

[40] 2013 CCA LEXIS 644 at *8.

[41] No. ACM 38788, 2016 CCA LEXIS 393 at *6 (A.F. Ct. Crim. App. July 7, 2016) (unpublished). *See also United States v. Palma,* No. ACM 38638, 2015 CCA LEXIS 444

Here, the military judge found no facts regarding the surrounding circumstances or the manifest knowledge of Appellee that, when considered in conjunction with the precise wording of nature-of-the-accusation advice, renders the advice sufficient. We again identify nothing from the record to conclude either that the military judge's findings are incomplete or that he failed to consider important facts.

The Government argues, "Law enforcement properly oriented Appellee to the suspected offenses when they informed him of the punitive Articles of which he was suspected,"[42] and that "the Military Judge erred as a matter of law—applying a higher standard than the law requires—in finding that law enforcement had to provide Appellee with additional, specific details about the suspected misconduct to further orient Appellee."[43] This ignores, however, that "each case must turn on its own facts . . . ."[44] The facts of one case may reveal that advising a suspect of the Articles allegedly violated is sufficient to orient the accused, and the facts of another may reveal that more is required. This case falls into the latter category.

As is the general way of things, many cases involve post-rights advisement, waiver, and confession claims of inadequate orientation. This case, however, has the unique twist of a suspect, *pre-rights waiver*, requesting information regarding the nature of the accusation, thus expressing inadequate orientation. As the military judge correctly concluded, "Where an accused clearly expresses that he does not understand what transaction or incident gave rise to the rights advisement, that is powerful evidence that the accused has not been

---

at \*15–16 (A.F. Ct. Crim. App. Oct. 19, 2015) (unpublished) ("Appellant understood that the reason investigators searched his home twice was to find evidence in connection to a sexual assault allegation. He also knew that samples and swabs were taken from his genitals and other areas of his body because he was suspected of committing sexual assault. There was no doubt in his mind that these investigative steps leading up to and including his interview on 6 March 2013 were related to an allegation against him for sexual assault. Given the circumstances, we find the rights warning to Appellant, advising that he was suspected of an Article 120 offense, without further clarification, was sufficient to focus him on the accusation against him. The rights advisement, considered in light of the surrounding circumstances and the manifest knowledge of the accused, was sufficient to satisfy Article 31, UCMJ, under the specific facts of this case.").

[42] Appellant's Brief at 9.

[43] Appellant's Brief at 15.

[44] *Nitschke,* 12 C.M.A. at 492, 31 C.M.R. at 78.

sufficiently oriented and advised in accordance with the requirements of Article 31 and [Mil. R. Evid.] 305."[45]

The Government urges support for its position from Supreme Court precedent, arguing that "police are not required to 'supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'"[46] But the broader context of that quote from *Moran v. Burbine* belies any usefulness here: "*[W]e have never read the Constitution to require* that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."[47] At issue there was the Fifth Amendment privilege against self-incrimination, as protected by *Miranda v. Arizona*, and at issue here is Article 31(b). There is overlap to be sure, but the latter's nature-of-the-accusation advice requirement has no counterpart in the former.[48] And we are concerned here not with a *flow* of information, but law enforcement's refusal to provide *any* information—in response to a specific request from Appellee to alleviate his confusion—regarding the transaction or incident in which he was allegedly involved other than the titles and sterile explanations of the UCMJ Articles.

An example of a pre-rights waiver flow of requested information, which an interrogator may reasonably cut off without offending Article 31(b), is found in *Oakley*:

> During the appellant's NCIS interrogation, [the interrogator] asked the appellant if he knew why he was there. The appellant responded that he did not. [The interrogator] then stated that an event took place at his father's house that was subsequently reported. When the appellant still seemed confused, [the interrogator] presented him with an Article 31(b) waiver identifying the suspected crime as "indecent assault" under Article 134, UCMJ. The appellant replied that he understood what indecent assault was. [The interrogator] further stated that an incident occurred between the appellant and his stepsister at a family gathering on April 29. The appellant asked, "What happened?" [The interrogator] replied, "Would you like to talk to us?" The appellant then said he wanted to know what was "going

---

[45] Appellant's Mot. to Attach, App'x B at 4.

[46] Appellant's Brief at 21 (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)).

[47] 475 U.S. at 422 (emphasis added).

[48] *See Rogers*, 47 M.J. at 137 ("*Miranda* does not require rights' warnings as to the nature of the offense.").

on" and agreed to waive his rights. Shortly thereafter, [the interrogator] said they had information that he may have had a "sexual interaction with [his] stepsister."[49]

Whereas in *Oakley*, the interrogator had already informed the appellant of the date, location, and victim of the alleged offense before cutting to the chase, *no* details were provided here. Instead, Appellee's desire to learn *any* details of the accusation was the carrot to entice his rights waiver, as the military judge correctly concluded:

> The first advisement . . . improperly used the Accused's own request to be oriented to the transaction or incident of which he was suspected, as leverage to induce the Accused to waive his rights. The government agents invited the Accused to waive his rights and talk to them expressly so that they would then be able to orient him to the transactions and incidents they were investigating.[50]

The Government next argues that any deficiency in the first rights advisement was cured by the second, and the military judge abused his discretion in concluding otherwise. We disagree.

The Government attacks this portion of the military judge's ruling on multiple fronts. Countering his criticism of the special agent for not advising Appellee of the nature of the wrongful broadcast of intimate visual images accusation the first go-round, the Government argues that "the sending of intimate images was sufficiently related to the extortion advisement and Appellee's conduct of sending the intimate images to the Victim was within the frame of reference supplied by the extortion warning."[51] *Had* Appellee in fact been sufficiently oriented to the nature of the extortion accusation, we may agree with the Government's argument that the alleged wrongful broadcast of intimate visual images to the alleged victim—during the course of allegedly extorting

---

[49] 2015 CCA LEXIS 154 at *27–28 (last alteration in original) (footnotes omitted).

[50] Appellant's Mot. to Attach, App'x B at 4.

[51] Appellant's Brief at 26.

her for more[52]—was within the frame of reference of the extortion warning.[53] But deficient advice concerning the nature of one accusation does not excuse absent advice concerning the nature of another.

---

[52] The military judge found:

> [NCIS special agents] had interviewed the alleged victim and knew the allegations involved extortion by messaging from phone numbers unknown to the victim, including allegedly sending at least one intimate image of the victim to her. Prior to the interrogation, the NCIS special agents had obtained the information linking the Accused to the phone numbers used allegedly for extortion.

Appellant's Mot. to Attach, App'x B at 5.

[53] *Compare Reynolds*, 16 C.M.A. at 405, 37 C.M.R. at 25 ("[I]t is apparent [the interrogator] did not comply with the terms of Code, supra, Article 31, before interrogating the accused. Thus, he frankly admitted he made no effort to inform Reynolds that he was suspected of taking [the victim]'s car, although he believed Reynolds to have done so. He further admitted he knew this to be a separate and distinct crime from that into which he was ostensibly inquiring, but considered he sufficiently advised accused by limiting the inquiry to the period of unauthorized absence involved. That such is insufficient to inform accused "of the nature of the accusation" against him and thereby deprive him of any meaningful choice concerning whether to speak or remain silent is patent."), *and United States v. Huelsman*, 27 M.J. 511, 514 (A.C.M.R. 1988) ("In some cases, the unnamed offense may be so closely related to the charged offense that the rights advisement as to the nature of the offense necessarily includes the activity of the unnamed offense. No reasonable stretch of imagination can relate writing bad checks to the government and acting as a courier of illegal drugs. A warning concerning the bad check offense would neither arouse suspicion of, nor orient an accused to, a violation of Article 112a." (citation omitted)), *with United States v. Carter*, No. NMCCA 200601139, 2007 CCA LEXIS 174 at *11–12 (N-M. Ct. Crim. App. May 23, 2007) (unpublished) ("The rights waiver form . . . orients the appellant to burglary, larceny, and conspiracy. [The interrogator] explained to the appellant that a burglary requires the entry into a dwelling at nighttime with the intent to commit an offense, not just a larceny, inside that dwelling. The appellant then stated he understood what a burglary was as described by [the interrogator. The interrogator] then oriented the appellant to the evening of 31 August 2003, and stated that he wanted to know how the appellant came into possession of the stolen ATM card. At this point, the appellant was oriented to the burglaries committed in base housing on 31 August and 1 September 2003, and the offenses committed inside the burglarized dwellings. The appellant's acts that night were 'part of a continuous sequence of events,' the contact with the child was 'within the frame of reference supplied by the warnings,' and [the interrogator] had no more than a reasonable suspicion that the appellant touched the child before questions were asked on that topic. *See Simpson*, 54 M.J. at 284." (footnote omitted)), *United States v. Burkett*, No. NMCM 97 00203, 1998 CCA LEXIS 411 at *10–11 (N-M. Ct. Crim. App. Aug. 31, 1998) (unpublished) ("[W]hile the appellant was informed that

The Government also takes issue with the military judge's conclusion that the special agent bungled the second rights advisement by failing to "readvis[e Appellee] that he was still also suspected of . . . the offenses mentioned during the original advisement."[54] The Government's point regarding this discrete aspect of the military judge's ruling is well taken, since, at this moment in the interrogation, the "manifest knowledge of the accused" included—at last—ample details of the area of suspicion that focused him toward the circumstances surrounding the event, an important fact that the military judge failed to consider if this was the determinative circumstance among the totality. But there's more.

The military judge found that "[t]he government agents also characterized the second rights advisement as a mere formality,"[55] and that:

---

he was suspected in the theft of Government property, the agent did not advise him that he was also suspected of conspiring to sell and selling that same military property. . . . We are confident, as was the military judge, that the appellant was adequately oriented to the nature of the incident the authorities were investigating and of his right not to make a statement of any kind concerning it."), *United States v. Piazza*, No. NMCCA 200301263, 2005 CCA LEXIS 370 at *7–8 (N-M. Ct. Crim. App. Nov. 22, 2005) (unpublished) ("The appellant was convicted of an ongoing scheme to kidnap, rob, and eventually cause the death of [the victim]. These crimes were not separate and distinct. Instead, the crimes all stemmed from one fact pattern; this gave the appellant notice of the general nature of the crimes for which he was being questioned."), *United States v. Stamats*, 45 C.M.R. 765, 774 (N.C.M.R. 1971) ("[A]lthough appellant was twice interviewed, at *no* time was he ever further advised that in addition to being suspected of murder, he was also suspected of the offenses of felony murder, conspiracy to murder and rob the victim and the robbery of the victim. . . . When [the interrogator] told appellant that he was suspected of murder, that warning was sufficient, in our opinion, and we so hold, to fulfill the requirements of Article 31, UCMJ" since the investigation involved not "separate transactions," but a "continuous sequence."), *and United States v. Redd*, 67 M.J. 581, 588–89 (Army Ct. Crim. App. 2008) ("[T]he allegation of sexual misconduct involving a child occurred during the same period of time that appellant was illegally downloading child pornography. Therefore, the conduct being investigated, as well as the questioning process, was "continuous in nature." *Simpson*, 54 M.J. at 284. Second, the original allegation of use of a computer to commit child sex offenses through the use of internet chat was sufficiently related to the allegation of possession of downloaded child pornography as to orient appellant to the nature of the offense.").

[54] Appellant's Mot. to Attach, App'x B at 5.

[55] Appellant's Mot. to Attach, App'x B at 5. This finding of fact is supported by the evidence; it is a fair characterization of the language used by the special agent, describing the second rights advisement as "just kind of an administrative thing" and that she was "just gonna [sic] go over it quickly." Video Rec'g of Appellant's NCIS Inv'w, App. Ex. III, encl. 5 at 2:12:30.

> At the first advisement, the Accused had accepted the agents'
> improper and express invitation to waive his rights so that they
> could orient him to the transaction or incident in which he is
> suspected of being involved, and he then made admissions to
> them about the allegations, and the same agents then purport-
> edly sought to cure earlier defects in a cursory manner that could
> not possibly cure the taint effectively, and instead the agents
> downplayed the significance of the purported curative instruc-
> tion by calling it a formality.[56]

We have previously explained, "A proper rights advisement under Article
31(b) and [*United States v.*] *Tempia*[57] is more than a formality—it is not 'just
a piece of paper' or a mere 'form' . . . ."[58] Our peer courts have issued similar
denouncements of minimization during this solemn process.[59] The military
judge correctly held the line, and he continued:

---

[56] Appellant's Mot. to Attach, App'x B at 5–6.

[57] 16 C.M.A. 629, 631, 37 C.M.R. 249, 251 (1967) (holding that "the principles enun-
ciated by the Supreme Court in *Miranda v Arizona* apply to military interrogations of
criminal suspects." (citation omitted)).

[58] *United States v. Patterson*, No. 202200262, 2024 CCA LEXIS 130 at *13 (N-M.
Ct. Crim. App. Apr. 4, 2024) (unpublished).

[59] *See United States v. Campbell*, 76 M.J. 644, 655 (A.F. Ct. Crim. App. 2017) ("We
would like to clearly and unequivocally emphasize that when reading a suspect his or
her rights, criminal investigators are not authorized, and have no legitimate purpose,
to create confusion about any aspect of the rights advice, including the nature of the
allegation. While the law may allow investigators to use deceit during other portions
of an interview, the rendering of rights advice must be clear, honest, and understand-
able."); *United States v. Reimonenq*, Nos. 25-007(62), 1509, 2025 CCA LEXIS 272 at
*16–17 (C.G. Ct. Crim. App. June 18, 2025) (unpublished) (citations omitted) ("As the
military judge aptly stated, 'Even if such a misstatement [that the agents did not sus-
pect him of anything] doesn't completely vitiate the warnings under Article 31, it none-
theless significantly undercuts the accused's understanding of "the nature of the right
being abandoned and the consequences of the decision to abandon it." ' We agree. This
is further enhanced by the agent's repeated reference to the rights advisement as 'pa-
perwork' and his statements that the potential offenses listed on the [rights advise-
ment form] were just what was 'brought to our attention,' that perhaps something Ap-
pellee said may have been 'taken out of context,' and 'that's why we want to talk to
you.' "). *Cf. United States v. Erie*, 29 M.J. 1008, 1012–13 (A.C.M.R. 1990) ("The appel-
lant's admission that he had sold drugs to named individuals was a significant event
punctuated by a brief cessation in interrogation during which [the interrogator] left
the room. [The interrogator]'s statement on his return, 'I should probably advise you

Each time, the Accused signed a rights waiver form, but the
Court may not accept that as the endpoint of the analysis when
the far greater weight of the evidence shows material impropri-
ety and inadequacy in the advisements which directly contra-
venes the idea that the Accused was acting knowingly and vol-
untarily in doing so. *North Carolina v. Butler*, 441 U.S. 369
(1979).[60]

This was clear reference to the Supreme Court's pronouncement in *Butler*:

An express written or oral statement of waiver of the right to
remain silent or of the right to counsel is usually strong proof of
the validity of that waiver, but is not inevitably either necessary
or sufficient to establish waiver. The question is not one of form,
but rather whether the defendant in fact knowingly and volun-
tarily waived the rights delineated in the *Miranda* case.[61]

The military judge thus concluded that, in light of various circumstances,
including the defective initial advisement, minimization of the second, and the
lack of meaningful intervening circumstances between the two,[62] Appellee did

---

of your rights for distribution,' suggested to the appellant that a separate rights warn-
ing was in order for the suspected offenses of distribution of controlled substances and
emphasized the fact that a separate rights warning would not be given. The appellant
could have perceived his disclosures as being made without the benefit of a
proper rights advisement. We find that the appellant in fact concluded that his state-
ments would not be admissible against him in a court-martial proceeding . . . . Under
these circumstances, we find that the element of the rights advisement which admon-
ishes an accused that his statements may be used in evidence against him was vitiated
and that the 'waiver' evidenced by his decision to discuss his drug distribution activi-
ties was not made with a 'full awareness' of the 'consequences of his decision.' *See Mo-
ran v. Burbine*, 475 U.S. at 421.").

[60] Appellant's Mot. to Attach, App'x B at 6.

[61] *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

[62] The military judge found:

The agents advised the Accused that nothing used previously could be
used against him, and asked him if he wanted to waive his rights and
speak with them, but they did so without any change in the govern-
ment agents involved, without a meaningful break in time or other at-
tenuation of any previous taint, or even a meaningful explanation of
the previous taint, and further, without readvising him that he was
still also suspected of either the offenses mentioned during the original
advisement.

not knowingly and voluntarily waive his rights. Having considered the totality of the circumstances, we agree that the rights advisements and waivers, already reduced to a fee for any information about the nature of the accusations against him, then further reduced to a mere formality, suppressed Appellee's "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[63]

Under the particular facts of this case, and after considering the evidence in the light most favorable to Appellee, we conclude that the military judge did not abuse his discretion in suppressing Appellee's statements to NCIS special agents since they were taken in violation of Article 31(b), and Appellee did not voluntarily, knowingly, and intelligently waive his rights.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, the Government's appeal is **DENIED**. The case is returned to the Judge Advocate General for remand to the military judge.

---

Appellant's Mot. to Attach, App'x B at 5. This appears to be an application of the Supreme Court's attenuation test in *Brown v. Illinois*:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an [illegality]. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

422 U.S. 590, 603–04 (1975) (footnotes omitted) (citations omitted).

[63] *Moran*, 475 U.S. at 421.

KORN, J (concurring):

I join in the majority's decision to deny the Government's appeal. I write separately to emphasize the limited scope of our decision. As the majority opinion notes, we are required to "consider the evidence in the light most favorable to the party that prevailed at trial—in this case, Appellee,"[64] and absent an abuse of discretion by the military judge, we must affirm the decision below. "An abuse of discretion means that 'when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment . . . .' "[65] "The abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range."[66] Under such constraints on our authority to review the military judge's ruling, we deny the Government's appeal. However, I write separately to stress that our decision should not suggest to trial courts or practitioners that a rights advisement that simply lists the alleged offenses is inherently insufficient to inform a suspect of the nature of the accusation.

The majority opinion provides a wealth of case law analyzing what information is sufficient to put a suspect on notice of the nature of the accusation and effectively distinguishes those cases from the case before us. The key to that distinction lies not in the precise language in the warning the NCIS special agent provided to Appellee, but in the military judge's finding of Appellee's confusion about the allegations against him. Thus, we do not find as a matter of law that the rights advisement was legally insufficient to inform Appellee of the nature of the accusation. Instead, we deny the Government's appeal because nothing in the record before us, viewed in the light most favorable to Appellee, provides us with a definite and firm conviction that the military judge committed a clear error of judgment. We are therefore bound to accept the military judge's finding that Appellee "had not been sufficiently oriented to the transactions or incidents about which the government agents wanted to question" him.[67]

---

[64] *Flanner*, 85 M.J. at 169 (citation omitted).

[65] *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citation omitted)).

[66] *Id.* at 187 (C.A.A.F. 2004) (citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)).

[67] Appellant's Mot. to Attach, App'x B at 3–4.

The majority opinion includes a painstaking review of the case law on this issue. What is not included, and what Appellee does not cite in his brief, is a single case from our superior court, from this Court, or from any of our sister courts, which concludes that simply providing a suspect with the title of the UCMJ Article he's suspected of violating is inherently insufficient to inform him of the nature of the accusation. And we do not make that determination here.

*Johnson*, cited in the majority opinion, provides a useful backdrop: "The principal purpose of requiring that an accused be informed of the nature of the crime of which he is suspected is to orient him about the accusation so he can intelligently refuse to answer any question concerning it."[68] With that principle underlying our review, the litany of cases cited in the majority opinion comes into greater focus. The overarching standard is that law enforcement is prohibited from informing a suspect he will be questioned about a particular crime but then asking about an unrelated allegation.

The cases in the majority opinion that demonstrate how law enforcement can fail to properly orient a suspect involve such impermissible failures to warn of additional offenses. In *Reynolds*, for example, the interrogator oriented the suspect on a time period when he was suspected of being in an unauthorized absence status, but following the rights waiver questioned him about stealing a car.[69] Similarly, in *Huelsman*, the suspect was warned that he was suspected of committing larceny by writing bad checks but was ultimately questioned about acting as a courier of illegal drugs.[70] This deceptive manner of failing to inform a suspect of the nature of a secondary accusation is unlike a straightforward recitation of the titles of alleged offenses, which involves no intentional omission and does not inherently fail to orient a suspect. This case, therefore, rises and falls on the standard of review under which we consider the military judge's findings of facts and ruling, and does not establish a binding rule for trial courts.



FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[68] *Johnson*, 5 C.M.A. at 803, 19 C.M.R. at 99.

[69] *Reynolds*, 16 C.M.A. at 405, 37 C.M.R. at 25.

[70] *Huelsman*, 27 M.J. at 512–13.